**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CAVAL TOOL DIVISION, CHROMALLOY GAS TURBINE CORPORATION, Respondent.**

**Docket No. 00–4203.**

United States Court of Appeals, Second Circuit.

Argued May 3, 2001.

Decided Aug. 21, 2001.

James M. Oleske, Jr., National Labor Relations Board, Washington, DC, (Sharon I. Block, Supervisory Attorney, Leonard R. Page, Acting General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, on the brief) for Petitioner.

Richard I. Manas, Oppenheimer, Blend, Harrison & Tate, San Antonio, TX, for Respondent.

Before: NEWMAN and CABRANES, Circuit Judges, and UNDERHILL, District Judge.*

UNDERHILL, District Judge:

The National Labor Relations Board (the "Board") has applied for enforcement of an order in which it adopted the findings of Administrative Law Judge Michael A. Marcionese (the "ALJ"). After a two-day trial, the ALJ held that the respondent, Caval Tool Division, Chromalloy Gas Turbine Corporation[1] ("Caval"), violated Section 8(a)(1) of the National Labor Relations Act (the "NLRA"). Specifically, the ALJ determined that Caval violated the NLRA by suspending Diane Baldessari ("Baldessari") without pay and placing her on probation, because she challenged a new break policy at a company meeting. He further determined that Caval violated the NLRA by imposing overly broad probationary terms on Baldessari, who was found to have been prohibited from engaging in "protected concerted activity." Finally, the ALJ concluded that Caval maintained an overly broad employee solicitation/distribution rule. By order dated July 25, 2000, the Board adopted the ALJ's findings of fact and conclusions of law (the "Order") and required Caval to take the remedial action set forth therein. *See Caval Tool Division,* 331 NLRB No. 101, 2000 WL 1054862 (July 25, 2000).

Caval opposes enforcement of the Order, arguing that, in adopting the ALJ's conclusion that Caval violated Section 8(a)(1), the Board mistakenly held Baldessari's conduct to be "concerted activity" under Section 7 of the NLRA. Specifically, Caval argues that the ALJ applied an incorrect legal standard in determining that Baldessari's conduct was "concerted activity." Caval also argues that the Board erred in adopting the ALJ's conclusion that Caval violated Section 8(a)(1) because there was not substantial evidence in the record from which the ALJ could properly conclude that Baldessari was engaged in Section 7 "concerted activity." We find Caval's arguments to be without merit and, accordingly, enforce the Order.

---

* Stefan R. Underhill, of the United States District Court for the District of Connecticut, sitting by designation.

1. Chromalloy Gas Turbine Corporation sold Caval Tool Division during the pendency of this appeal. The parties have, however, stipulated that that sale has no effect on this appeal because the Order was binding not only on Caval, but also on its successors and assigns.

## BACKGROUND

The following facts were found by the ALJ and adopted by the Board. On August 14, 1998, Caval held a series of informational meetings for its employees, all of which were conducted by Caval's president, Paul Pace. Each meeting included a period for questions and comments. Baldessari, a computer programmer, attended the 11:30 a.m. meeting with other employees holding similar positions.

At that meeting, Pace expressed dissatisfaction with worker productivity and "scrap" rates at Caval. Specifically, Pace lamented the amount of production "downtime" and the fact that employees were often seen lingering around the company's vending machines. Pace also announced a change in the company's break schedule that was intended, at least in part, to address the concerns about worker productivity. Under the new break policy, employees would receive two ten-minute breaks, one in the morning and one in the afternoon, during which they were to take care of all of their personal business. Under the prior break policy, employees received one fifteen-minute break in the morning, but were free to leave their work areas throughout the day to get coffee from the company's vending machines or to attend to personal business.

After Pace announced the new break policy, Baldessari began to question Pace concerning the specifics of the policy. Baldessari first asked Pace if, under the new policy, employees would no longer be allowed to get coffee throughout the day outside of the designated break time, and if employees would be "written up" if they did so. Pace responded affirmatively to both questions.[2]

Baldessari then asked if the new break policy would apply to office employees. Pace responded by asking Baldessari if she would like the policy to apply to office workers. Baldessari responded affirmatively and stated that "it would be nice if things were fair for a change." Pace then stated that the policy would indeed apply to office workers.

Baldessari next asked Pace if the new break policy was meant to punish workers for the high "scrap" rate and downtime. After Pace asked Baldessari what she meant, she explained that she felt management was taking a privilege away from the workers (i.e., the ability to get coffee and conduct personal business outside of the designated break times) despite the fact that they had no control over the amount and timing of the work given them. Baldessari blamed management for scheduling problems leading to poor work flow. Pace responded to these comments by asking Baldessari if, to address her concerns, she would like him to fire all of the managers. Baldessari replied that that would be a start, except for one particular manager whom she considered to be a good manager. At that point, Pace expressed displeasure with Baldessari's continued complaints about management, and suggested a Human Resources employee "come up with a package so [Baldessari could] leave." Baldessari ceased her questioning, and the meeting continued.

That afternoon, Baldessari was escorted out of work and was placed on suspension for an indefinite period of time. After receiving permission from Caval, Baldessari returned to work on September 8, 1998 on probationary status for an indefinite term. By memorandum dated August

2. Notwithstanding these statements at the August 14, 1998 meeting, employees were in fact allowed to get coffee from the vending machines outside of the designated break time after the new break policy was implemented.

30, 1999, Baldessari was informed that her probation would be lifted the next day.

## STANDARD OF REVIEW

This court reviews the Board's legal conclusions to ensure that they have a reasonable basis in law. In so doing, we afford the Board "a degree of legal leeway." *NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 89–90, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995). We are "mindful that decisions based upon the Board's expertise should receive, pursuant to longstanding Supreme Court precedent, 'considerable deference.'" *Ewing v. NLRB*, 861 F.2d 353, 357 (2d Cir.1988) (citations omitted); *see also Office and Prof'l Employees Int'l Union v. NLRB*, 981 F.2d 76, 81 (2d Cir. 1992) ("Congress charged the Board with the duty of interpreting the Act and delineating its scope.").

Factual findings of the Board will not be disturbed if they are supported by substantial evidence in light of the record as a whole. 29 U.S.C. §§ 160(e) & (f); *Electrical Contractors, Inc. v. NLRB*, 245 F.3d 109, 116 (2d Cir.2001). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotations omitted). In other words, we must "determine whether the supporting evidence, even if not preponderating in this court's view, nevertheless provides a sufficient basis for the Board's decision." *NLRB v. Interboro Contractors Inc.*, 388 F.2d 495, 499 (2d Cir.1967).

## DISCUSSION

Section 7 of the NLRA was enacted "generally to equalize the bargaining power of the employee with that of his employer by allowing employees to band together in confronting an employer regarding the terms and conditions of their employment." *NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822, 835, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984). To that end, Section 7 guarantees employees certain rights, including the right "to engage in ... concerted activities for ... mutual aid or protection." 29 U.S.C. § 157. That right is protected through Section 8(a)(1), which provides that it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]." 29 U.S.C. § 158(a)(1).

The phrase "concerted activity" clearly "embraces the activities of employees who have joined together in order to achieve common goals." *City Disposal Systems, Inc.*, 465 U.S. at 830, 104 S.Ct. 1505. "Although one could interpret the phrase, 'to engage in concerted activities,' to refer to a situation in which two or more employees are working together at the same time and the same place toward a common goal, the language of § 7 does not confine itself to such a narrow meaning." *Id.* at 831, 104 S.Ct. 1505. Rather, that phrase also includes the actions of a single employee, acting alone, who intends to initiate group activity. *Id.* This is so because, "[t]o protect concerted activities in full bloom, protection must necessarily be extended to intended, contemplated or even referred to group action, lest employer retaliation destroy the bud of employee initiative aimed at bettering terms of employment and working conditions." *Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345, 1347 (3d Cir.1969) (internal quotations omitted).

In this case, the Board adopted the ALJ's finding that Baldessari's statements during the August 14, 1998 meeting "had the objective of initiating ... or ... inducing group action" in response to the company's new break policy and therefore constituted concerted activity. *Caval Tool*

*Division,* 2000 WL 1054862, at *10–*16. It further adopted the ALJ's finding that Caval suspended Baldessari and placed her on probation because of her questions and comments at the August 14, 1998 meeting. In so doing, the Board concluded that Caval engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(1) of the NLRA.

Caval disputes both the legal and factual bases for this conclusion. Specifically, Caval argues that the Board erred in adopting the ALJ's legal conclusions because he either ignored or misapplied this court's holding in *Ewing v. NLRB,* 861 F.2d 353 (2d Cir.1988). Caval also argues that the Board erred in adopting the ALJ's factual findings because the ALJ lacked substantial evidence to conclude that Baldessari was engaged in "concerted activity." Neither argument has merit.

### The Board Applied the Correct Legal Standard

In *Alleluia Cushion Co.,* 221 N.L.R.B. 999, 1000, 1975 WL 6526 (1975) ("*Alleluia Cushion*"), the Board held that "where an employee speaks up and seeks to enforce statutory provisions relating to occupational safety designed for the benefit of all employees, in the absence of any evidence that fellow employees disavow such representation, we will find an implied consent thereto and deem such activity to be concerted." The Board later expanded this holding to situations outside the context of an employee asserting statutory rights, thus effectively adopting a rule that an employee's conduct would *per se* be "concerted," as long as the employee's actions concerned an issue of common interest. *See, e.g., Retail Clerks Union, Local 588,* 227 N.L.R.B. 7, 10, 1976 WL 7610 (1976) ("The absence of any outward manifestation of support for [employee's] efforts [concerning higher wages] is not sufficient to establish that the Respondent's employ-

ees did not share her interest or support her efforts to increase the wages."). The *Alleluia Cushion* rule was abandoned by the Board in *Meyers Industries, Inc.,* 281 N.L.R.B. 882, 1986 WL 54414 (1986) ("*Meyers II* "). In that case, the Board held that an individual's action must have "some linkage to group action in order for conduct to be deemed 'concerted' within the meaning of Section 7." *Ewing,* 861 F.2d at 358 (approving the *Meyers II* rule).

Caval asserts that the Board erred in adopting the ALJ's legal conclusions because the ALJ relied, although not explicitly, on *Alleluia Cushion* in reaching his decision. Specifically, Caval argues that the ALJ held that Baldessari's actions were necessarily concerted solely because she spoke out at a company meeting, thereby implicitly reverting to the now defunct *Alleluia Cushion* rule. Caval further asserts that the ALJ's reliance on *Whittaker Corp.,* 289 N.L.R.B. 933 (1988) ("*Whittaker* "), does not save the Order from legal attack because *Whittaker* itself improperly applies the *Alleluia Cushion* rule.

Caval's legal challenge to the Order is mistaken for several reasons. As a preliminary matter, Caval incorrectly asserts that the ALJ found Baldessari's conduct to be "concerted" solely because she spoke out at a company meeting. The Order is not so limited. The ALJ's "Conclusions of Law," read literally, state that Baldessari was improperly prohibited from engaging in concerted activity "because she had spoken at a group meeting called by the Respondent." The Order, however, elsewhere makes clear that the ruling turned on the nature of Baldessari's comments. Read as a whole, the Order demonstrates that Baldessari's questions and comments were concerted not merely because they were made at an employee meeting called

by Caval, but because they were directed at an announced change in the terms and conditions of employment, the new break policy.

■ The Order is consistent with *Whittaker* and analogous cases, sometimes collectively referenced as the "group meeting" cases. In *Whittaker*, the Board explicitly acknowledged *Meyers II's* overturning of *Alleluia Cushion*, but also noted that *Meyers II* did not change the Board's earlier rule that "the guarantees of Section 7 of the Act extend to concerted activity which in its inception involves only a speaker and a listener, for such activity is an indispensable preliminary step to employee self-organization." *Whittaker*, 289 N.L.R.B. at 933. Under this longstanding Board doctrine, the speech of an individual employee is "concerted as long as it is engaged in with the object of initiating or inducing ... group action." *Id.* The *Whittaker* Board went on to hold, more specifically, that the requisite intent to initiate or induce group action could be inferred in the context of a group meeting held to discuss the terms and conditions of employment. *Id.* The Board and the courts have followed this rationale in myriad analogous cases. *See, e.g., NLRB v. Talsol Corp.,* 155 F.3d 785, 796–97 (6th Cir.1998); *NLRB v. Henry Colder Co.,* 907 F.2d 765, 767–68 (7th Cir.1990); *CKS Tool & Eng'g, Inc.,* 332 N.L.R.B. No. 162, 2000 WL 1920357, at *1 n. 1, *12–*13 (Dec. 29, 2000); *Myth Inc.,* 326 N.L.R.B. No. 28, 1998 WL 537515, at *22–*24 (Aug. 20, 1998); *Timekeeping Sys., Inc.,* 323 N.L.R.B. 244, 247–48 (1997); *Grimmway Enterprises, Inc.,* 315 N.L.R.B. 1276, 1279–80, 1995 WL 15049 (1995).

Caval asks us to depart from *Whittaker* and the "group meeting" cases on the ground that they improperly resurrect *Alleluia Cushion.* We decline to do so. It is well established that this court must afford the Board "considerable deference" when reviewing decisions based upon the Board's expertise. *Ewing,* 861 F.2d at 357. While this court ultimately held that the Board had the discretion to reject *Alleluia Cushion* in favor of *Meyers II,* it acknowledged that the NLRA "could be read to support either ... interpretation of concerted activity...." *Id.* at 359. Because either rule is a defensible construction of the NLRA, it follows that the Board's adoption of *Whittaker,* at most a limited reversion to *Alleluia Cushion,* is well within the Board's discretion. Accordingly, we defer to the Board's interpretation.

### The Board's Holding is Supported by Substantial Evidence

■ Caval attacks the finding that Baldessari was engaged in "concerted activity" as unsupported by substantial evidence. Caval asserts that, although the ALJ made no explicit finding, the record as a whole makes clear that Baldessari was disciplined not because of her initial questions concerning the new break policy, but because of her "disruptive conduct" in accusing Pace of punishing the production employees and in criticizing management. From this premise, Caval argues first that the record lacks substantial evidence to demonstrate that Baldessari's conduct was "concerted" because there was no evidence to demonstrate that Baldessari's comments concerning management (as opposed to her questions concerning the break policy) were meant to initiate, induce or prepare for group activity. Caval next argues that the undisputed evidence demonstrates that Baldessari did not act in the interests of the employees present at the meeting, and in fact acted against their interests. We are unpersuaded by both arguments.

■ Caval correctly notes that, as a general matter, in order properly to con-

clude that Caval violated Section 8(a)(1), the Board must have found that "the discharge or other adverse personnel action was motivated by the protected activity." *NLRB v. Oakes Machine Corp.*, 897 F.2d 84, 88 (2d Cir.1990). Caval is mistaken, however, in arguing that the Board failed to make such a finding. The Order, by adopting the ALJ's recommended order, specifically states that "it is clear that [Caval] would have taken no action against Baldessari absent her questions and comments at the meeting." *Caval Tool Division*, 2000 WL 1054862, at *12. The Board also examines both "Baldessari's questions and comments" concerning the new break policy and her "comments, in response to Pace's question about firing all the managers," and finds both to have been protected activity. *Id.* at *10–*11. Specifically, the Order states that Baldessari's "comments about the impact of the managers' scheduling on the production employees['] productivity flowed from these concerns that production employees were not being treated fairly," and were, therefore "concerted." *Id.* at *10. The Board found that Baldessari's "comments in response to Pace's question about firing all the managers," were "concerted" because, under the circumstances, they bore a direct relationship to her concern that the change in the break policy was meant as punishment for the workers' reduced productivity. *Id.* at *11. Having found that "Baldessari was engaged in protected concerted activity at the August 14, 1998 meeting," the Board then concluded, under its rule in *Mast Adver. & Publ'g, Inc.*, 304 N.L.R.B. 819, 1991 WL 187501 (1991), and other similar decisions, that "it necessarily follow[ed] that her suspension that day was unlawful." *Id.* at *12.

Moreover, the Board's findings are supported by substantial evidence. For example, it was reasonable to conclude from the August 28, 1998 letter from Caval to Baldessari (advising her that her suspension would end and a term of probation would begin), that Baldessari was disciplined for all of her comments at the meeting, not simply those aimed at management. Although the letter specifically admonishes Baldessari for having "accused [Pace] of punishing our workers," and for having "stated that all of the managers, except for Ted Cichy, could not do their jobs and should be fired," Caval also more generally chastises Baldessari for having "intentionally provoked an argument over the new coffee break policy." The letter also references Baldessari's prior dissatisfaction with the company and the fact that Baldessari "repeatedly challenged Chromalloy's right to set and enforce policies and ... often compared Chromalloy with your previous employer, John Caval." Finally, the letter makes clear that Baldessari would be terminated if, during her probation, she "engaged in any disruptive behavior," including "challenging [Pace's] right or the right of managers to set policy [and] openly criticizing management decisions." Thus, the record's only written expression of Caval's reasons for disciplining Baldessari amply supports the Board's findings.

Caval correctly notes that some testimony indicated that Baldessari was terminated for her disruptive conduct, rather than her questions concerning the new break policy. Specifically, Baldessari testified that Pace told her that she was being disciplined because she made him look like a fool during the meeting and disrupted the meeting. Caval's witnesses similarly testified that Baldessari was disciplined for disparaging Pace in front of the other employees. It is true that "[t]he fact that an activity is concerted ... does not necessarily mean that an employee can engage in the activity with impunity." *City Disposal Sys., Inc.*, 465 U.S. at 837,

104 S.Ct. 1505. Moreover, an employee "may engage in concerted activity in such an abusive manner that he loses the protection of § 7." *Id.* Nevertheless, in other labor contexts, we have held that employees receive "some leeway since passions may run high and impulsive behavior is common." *Montefiore Hosp. & Med. Ctr. v. NLRB*, 621 F.2d 510, 517 (2d Cir.1980). Other courts, as well as the NLRB itself, have held similarly. *See, e.g., Exploration & Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 238 (5th Cir.1999); *NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir.1965) ("The employee's right to engage in concerted activity may permit some leeway for impulsive behavior which must be balanced against the employer's right to maintain order and respect."); *Mast Adver. & Publ'g*, 304 N.L.R.B at 819.

The testimony the ALJ found credible supports the finding that Baldessari's comments concerning management, while perhaps not the model of diplomacy, were, under the circumstances, made only in response to Pace's own question, and were directly related to her concern that the new break policy was being instituted as punishment. Accordingly, even if Baldessari's comments concerning management were part of the motivation for disciplining her, her concerted activity did not exceed the bounds of protected conduct for which she may not be disciplined.

■ Caval's second attack on the factual foundation of the Order also fails. Caval argues that Baldessari was not engaged in "concerted activity" because the undisputed evidence demonstrates that she did not act in the best interests of the other employees present at the meeting. In fact, Caval asserts, Baldessari was acting against the interests of those present at the meeting because both she and the other employees present at the meeting, who were all of a similar job grade level, would not have lost the privilege of unofficial break time if Baldessari had not insisted that all employees be treated like the production employees. At best, Caval argues, Baldessari was advancing the interests of the production employees, none of whom was present at the meeting.

We are unpersuaded by these arguments because Caval wrongly assumes that Baldessari's comments can only be interpreted as a request that those present at the meeting lose the unofficial break time. It was more than reasonable to infer from the record that Baldessari was insisting that the restriction on the conduct of personal business outside the designated break time be applied to management, not to the programmers and others present at the meeting. It was also reasonable to infer that she was not requesting that the programmers lose unofficial break time, but rather that the production employees not be punished for conditions out of their control. Similarly, Caval wrongly assumes that Baldessari was advocating for the loss of a benefit simply because she demanded that the new break policy be administered equally.[3] Thus, it was reasonable to infer that Baldessari's questions were calculated to cause Pace to respond that *no* employees would lose the unofficial break time, as indeed turned out to be the case. The Board's finding that Baldessari was engaged in "concerted activity" is supported by substantial evidence.

### CONCLUSION

We have considered Caval's remaining contentions and find them to be without

---

3. Thus, to the extent the interest sought to be advanced by Baldessari is viewed more broadly as the interest in an equitable work environment, the programmers and others at a similar job grade level present at the meeting would have the same interest as the production employees not present at the meeting.

merit. Accordingly, the Board's petition for enforcement is granted.