10-3511-ag (L)
NLRB v. Starbucks Corporation

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2011

Heard: November 22, 2011                    Decided: May 10, 2012

Docket Nos. 10-3511-ag, 10-3783-ag(XAP)

- - - - - - - - - - - - - - - - - - - - - - - -
NATIONAL LABOR RELATIONS BOARD,
        Petitioner-Cross-Respondent,

                v.

STARBUCKS CORPORATION, d/b/a STARBUCKS
COFFEE COMPANY,
        Respondent-Cross-Petitioner.
- - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, WINTER and KATZMANN,  Circuit Judges.

Petition to enforce  the August 26, 2010, decision and order of the National Labor Relations Board ruling that employer committed various unfair labor practices and cross-petition to review the decision insofar as the Board determined that a an employer's dress code limiting employees to wearing only one pro-union button on their work clothes and the discharge of two employees are unfair labor practices.

Petition enforced only as to unfair labor practices not challenged by employer; cross-petition for review granted as to the dress code violation and the discharge of one employees; case remanded as to the discharge of the other employee.

Judge Katzmann concurs with a separate opinion.

Jeffrey W. Burritt, National Labor Relations Board, Washington, D.C., (Robert Englehart, Supervisor Attorney, Lafe E. Solomon, Acting General Counsel, Celeste J. Mattina, Acting Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, National Labor Relations Board, on the brief), for Petitioner-Cross-Respondent.

Patricia A. Millett, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C. (Daniel L. Nash, Stacey R. Eisenstein, Hyland Hunt, Akin Gump Strauss Hauer & Feld LLP, on the brief), for Respondent-Cross-Petitioner.

JON O. NEWMAN, <u>Circuit Judge</u>.

This petition for enforcement of an order of the National Labor Relations Board ("the Board") and an employer's cross-petition for review primarily concern the validity of an employer's dress code provision limiting employees to displaying only one pro-union button on their work uniforms. Also at issue are the discharges of two employees. These issues arise out of efforts to unionize employees at several Starbucks coffee shops in Manhattan. The Board seeks enforcement of its August 26, 2010, order finding Respondent-Cross-Petitioner Starbucks Corporation, d/b/a Starbucks Coffee Company ("Starbucks" or "the company"), to have committed several unfair labor practices, including the three challenged in this case, in violation of subsections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1),

(3).  Starbucks cross-petitions to set aside the challenged portions of the Board's Order.  We conclude that Starbucks's enforcement of its one button dress code is not an unfair labor practice, nor was one of the two challenged discharges; as to the other discharge, a remand is required.  We therefore enforce in part, grant the cross-petition for review in part, and remand.

## Background

The following facts, essentially not disputed, were found by Administrative Law Judge Mindy E. Landow ("the ALJ") and adopted by the Board.  From 2004 to 2007, the Industrial Workers of the World ("IWW") engaged in a highly visible campaign to organize wage employees in four Starbucks stores.  Among other efforts, union supporters held protests, attempted to recruit "partners,"[1] and made numerous public statements to the media.

In response, Starbucks mounted an anti-union campaign aimed at tracking and restricting the growth of pro-union sentiment.  In the course of this campaign, Starbucks employed a number of restrictive and illegal policies.  These included prohibiting employees from discussing the union or the terms and conditions of their employment; prohibiting the posting of union material on bulletin boards in employee areas; preventing off-duty employees from entering the back area of one of the stores; and discriminating

---

[1]Starbucks retail stores are staffed by two classes of wage employees: "baristas" and shift supervisors.  Both types of employees are described internally as "partners."

against pro-union employees regarding work opportunities. In this Court, Starbucks does not challenge the Board's determination that this conduct violated the Act.

During this time period, the Board also found that Starbucks committed three additional violations. First, it found that a Starbucks policy prohibiting employees from wearing more than one pro-union button on work clothes was an unfair labor practice. Second, it found that Starbucks used protected activity to justify the discharge of pro-union employee Joseph Agins. Third, it found that Starbucks's decision to discharge pro-union employee Daniel Gross was primarily motivated by anti-union animus.

A. Starbucks's One Button Policy

Starbucks implements a comprehensive dress code for its employees. The code includes rules about appropriate types and colors of shoes, pants, socks, shirts, undershirts, and jewelry. The purpose of the dress policy, according to Starbucks's employee handbook, is to ensure that partners "present a clean, neat, and professional appearance appropriate of [sic] a retailer of specialty gourmet products." Additionally, Starbucks encourages employees to wear multiple pins and buttons issued by Starbucks as part of its employee-reward and product-promotion programs. The ALJ found that many of the adornments worn by employees are not obviously related to employee programs, and that the resulting public image is of a uniformed employee wearing a variety of unrelated pins and buttons on their hats and aprons.

-4-

Starbucks implemented a policy prohibiting multiple pro-union buttons following an informal settlement agreement between Starbucks and the Board in March 2006. Pursuant to that settlement agreement, Starbucks replaced its prior prohibition of all pro-union buttons with the following written policy:

> Partners are not permitted to wear buttons or pins that advocate a political, religious or personal issue. The only buttons or pins that will be permitted are those issued to the partner by Starbucks for special recognition or advertising a Starbucks-sponsored event or promotion; and reasonably-sized-and-placed buttons or pins that identify a particular labor organization or a partner's support for that organization, except if they interfere with safety or threaten to harm customer relations or otherwise unreasonably interfere with Starbucks [sic] public image.

Starbucks management interpreted this rule to preclude the wearing of more than one pro-union pin, and requested that several employees remove additional pins before being allowed to work.

The prohibited pins were less than one inch in diameter and bore the initials "IWW" in white letters against a red background. After examining photographs, the ALJ found that these pins were no more conspicuous in size or design than the Starbucks-issued pins.

B.  The Discharge of Joseph Agins

Beginning in May 2004, Joseph Agins worked at Starbucks's 9th Street store as a barista. In 2005, Agins became a vocal union supporter, and was identified as such by management in internal communications.

*The May 14 incident.* On May 14, 2005, Agins was working with Assistant Store Manager ("ASM") Tanya James and one other employee.

During a particularly busy period, Agins became agitated with James after she refused his request to help. When she eventually came to help, Agins said that it was "about damn time" she came on the line, and shoved a blender in the sink, causing a loud noise. He later stated, "[T]his is bullshit," and told James to "do everything your damn self." When James told Agins to clock out, he initially refused.

Based on this encounter, Starbucks generated a corrective action notice that informed Agins that "the aforementioned behavior, if repeated will result in termination of employment at Starbucks Corporation." However, the notice was never provided to Agins. Nevertheless, Agins was suspended for several days and apologized for his outburst.

*The November 21 incident.* Several months later, Agins and several other off-duty employees entered the 9th Street store to show support for on-duty workers who had been instructed, pursuant to the prior policy, to remove their pro-union pins. Agins and his companions were wearing union t-shirts, caps, and insignia, including pro-union pins and buttons.

Shortly after the group entered the store, Agins was approached by Ifran Yablon, an off-duty manager from the company's Upper West Side store, who happened to be a regular customer at the 9th Street store. There was bad blood between the two. At an IWW

rally several months before, Yablon had allegedly made derogatory remarks to Agins's father about the father's support for the IWW.

Yablon engaged Agins in a conversation about his union pin and whether Starbucks employees really needed a union. At some point, Agins spoke of Yablon's alleged insult to his father, and the conversation became heated. Both men used hand gestures, spoke loudly, and used obscenities. Agins admitted that he told Yablon, "You can go fuck yourself, if you want to fuck me up, go ahead, I'm here." Agins's fellow supporters then intervened to stop the argument, and he withdrew with them to a table while James approached Yablon and told him to "leave it alone." Yablon then left the store, and James went over to the table and admonished Agins. He listened to her and did not utter obscenities or make threatening gestures toward her. Agins and his companions left the store approximately ten minutes later.

*Agins is fired.* On December 12, when Agins came into work, he was asked to sit at the rear of the store with two managers. They informed him that he was being discharged for disrupting business. A subsequent document filed by Agins's District Manager ("DM") stated that Agins would be ineligible for rehire because "[p]artner was insubordinate and threatened the store manager. Partner strongly support [sic] the IWW union."

C. The Discharge of Daniel Gross

Daniel Gross was hired at the 36th Street store in May 2003. His first employee performance review, in November 2003, assessed his overall performance at 2.4 -- "meets expectations," on a scale of 1 (lowest) to 3 (highest). He was accorded particular praise for "legendary service."

In 2004, Gross became active in leading union organization efforts. On May 17 of that year he filed, on behalf of the IWW, a representation petition seeking to represent employees at the 36th Street store.

Gross's next performance review came shortly thereafter, on May 28, 2004. In it his manager assigned him an overall rating of 2.7 -- "exceeds expectations." His significant accomplishments included his ability to build relationships with customers and co-workers and his ability to keep calm in times of stress. His areas of improvement included engagement with the employee awards program, and "work in communicating changes in partner attitude (concerns, compliments, complaints) to . . . management."

In August 2004, Gross began attending law school and reduced his availability from five to two days per week.

Gross's next review occurred in May 2005. For the first time, this review included two "1" ratings -- in the categories of "Recognizes and reinforces individual and team accomplishments by using existing organizational methods" (employee awards), and

"Contributes to positive team environment by recognizing alarms or changes in partner morale and communicating them to the management team." Gross's continuing failure to hand out employee-to-employee awards was again cited, as well as his failure to communicate with management. As in other reviews, his ability to connect with customers was listed among his accomplishments.

Between May 2005 and January 2006, Gross's number of hours decreased dramatically. He worked a total of just twenty-five hours during that entire period, frequently giving away his shifts and asking for time off. Toward the end of this period, Gross's supervisor requested that he stop giving away his shifts to others, and he stopped doing so. Gross, however, did not increase his listed availability, and he continued to request time off, which was granted. As a result, Gross worked fewer hours than any other Starbucks employee from May 2005 up to the date of his discharge.[2].

In November 2005, Gross became a highly visible figure in the pro-union effort. He was quoted in various publications, including a high-profile article about the subject in the New York Times. He moderated a press conference on the unionization efforts, personally authored and signed letters to management, and authored and posted numerous press releases to a pro-union website. Id. Management was aware of Gross's activities and attempted to counter

---

[2]Although the Starbucks policy does not list a minimum number of hours, it states that "[p]artners may be expected to make themselves available for work for a minimum number of days or hours per week, depending on the store's need. The inability or failure to increase one's availability to work may result in separation of employment."

them with their own press releases and through letters to employees.

After a delay caused by Gross's two-month absence in the winter of 2005, he received his next performance review in late January 2006. Unlike most such reviews, a DM was present as well as Gross's Store Manager ("SM").[3] The review, which had an effective date of November 27, 2005, rated Gross at "1" in half of the categories, and "2" in the rest. Among others, he received a "1" in "Adheres to Starbucks values, beliefs, and principles." His overall rating was 1.5.

As a reason for the low scores, the evaluation cited Gross's low work hours and listed "[o]pening his availability" as an opportunity for improvement. The evaluation also stated that although "Dan is familiar with our beverages enough to know the basic standards of recipe and presentation," he has "had little exposure to our seasonal lineup" and "has not demonstrated that he has kept up his knowledge of current promotional items." The review also cited Gross's lack of proactivity, noted his continuing failure to participate in Starbucks's employee awards program and communicate with management, and stated that Gross "does not display . . . a positive attitude about Starbucks to partners and customers."

_____

[3]When Gross asked why a DM was present, the DM told him it was a new store policy. When he asked to see the policy in writing, the DM said that there was no policy and that it was just a "best practice."

Gross testified that he asked the DM if he would have to open up his availability in order to improve his performance review, and the DM said no. Gross was asked to fill out a new availability form, but he put down the same availability that he had previously listed. He also signed the review under protest, suggesting that the ratings be increased across the board.

His SM later noted in Gross's record that "Dan did not work frequently enough to receive a high score. We are hoping that with an increase in shifts that [Gross] works over the next review period that we can help him bring up his scores by exposing him to promos and partners." There is no indication, however, that Gross was made aware of this additional remark.

The ALJ concluded that some of these low scores were motivated by anti-union animus, but noted that "[i]t appears undisputed . . . that Gross did not meet company standards in other areas such as utilizing existing organizational methods to recognize coworkers, training new hires and communicating partner morale issues to store management."

Gross had his next performance review only two and a half months later, on April 14, 2006. The stated reason for the review was so new management could meet Gross and get "on the same page." During the meeting, managers presented Gross with a revised version of his previous evaluation, with new narrative comments and new scores. Overall, the performance evaluation was slightly higher,

partly because Gross's performance in "Maintains regular and consistent attendance and punctuality" was upgraded from a "1" to a "2" with a notation that "Dan, as agreed to during his last review, has worked all of his shifts as scheduled and has been on time and in dress code on all occasions." The rest of the evaluation continued to fault Gross for failing to engage in the employee awards program, for failing to adhere to Starbucks principles and values, for failing to display a positive attitude about the company, and for failing to communicate with management.[4]

An additional page of notes was attached to this review but never provided to Gross. The notes stated that Gross had failed to act on feedback and needed to increase his hours in order to improve. On April 29, Gross was given an "Update on Performance" by his SM. This memorandum listed Gross's lack of work availability and repeated many of the same deficiencies listed on previous evaluations. The memo stated if Gross did not improve these deficiencies and increase his hours by the next performance review, he would be terminated.

Gross, however, made no efforts to increase his hours or improve other deficient areas. Furthermore, between April 29 and his termination on August 5, 2006, Gross was cited twice for

---

[4]The ALJ credited testimony that, when Gross asked whether he would have to report co-worker complaints about working conditions and compensation in order to improve this last rating, he was told, "yes."

-12-

instructing employees or managers not to do cleaning work.[5]  The
ALJ also appears to have credited testimony from a fellow employee
that, during this period, Gross exerted little effort and displayed
limited knowledge of drinks.

On July 15, 2006, Gross had a tense encounter with DM Allison
Marx during a demonstration outside a Starbucks store in support of
a suspended employee, Evan Winterscheidt.  As Marx walked into the
store, Gross pointed his finger at her and repeated several times
that it would be "very bad for you to fire Evan Winterscheidt."
Later that evening, Gross left a message for Marx stating that any
action against Winterscheidt would be met with a "swift response."

Gross was discharged on August 5, 2006.  One of the stated
reasons was his threatening behavior toward Marx.  In addition,
Gross was provided with a final performance review, in which he
received a score of 1.4.  The review stated that Gross "does not
. . . say anything positive about the culture, values and mission
of Starbucks," that he made little effort beyond the bare minimum,
that he continued to refuse to participate in employee awards and
communicate with management, and that Gross had not sufficiently
improved his attendance.

---

[5]In the first instance, Gross told an ASM that she was too good
to be cleaning floors, and that that was not what she was paid to do.
In the second instance, Gross told an employee that stocking and
cleaning was not part of her job description, and that she was doing
more than she had to.  Both individuals reported these instances to
management.

D.    The ALJ's Decision and the Board's Affirmance

On December 19, 2008, ALJ Landow issued a decision concluding that Starbucks's one button policy violated section 8(a)(1) of the National Labor Relations Act and that the discharges of Agins and Gross violated section 8(a)(3) of the Act.

The Board affirmed these decisions on October 30, 2009, and again on August 26, 2010.[6]

Discussion

A. Standard of Review

Our standard of review is well established.  "Factual findings of the Board will not be disturbed if they are supported by substantial evidence in light of the record as a whole."  National Labor Relations Board v. Caval Tool Division, Chromalloy Gas Turbine Corporation, 262 F.3d 184, 188 (2d Cir. 2001).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.  (internal quotation marks omitted).  Legal conclusions "based upon the Board's expertise should receive, pursuant to longstanding Supreme

---

[6]The Board issued a second opinion following the United States Supreme Court's decision in New Process Steel, L.P. v. National Labor Relations Board, 130 S. Ct. 2635 (2010), which held that Board decisions must be supported by at least three members.  Member Hayes joined Member Schaumber and Chairman Liebman in affirming the latter two's previous decision.

Additionally, as noted, the Board affirmed a number of determinations that Starbucks does not contest in this Court.

Court precedent, considerable deference." Id. (internal quotation marks omitted).

B. The One Button Policy

Section 7 of the National Labor Relations Act guarantees to all employees "the right to self-organization . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157. Employers may not "interfere with, restrain, or coerce employees in the exercise of [those] rights." 29 U.S.C. § 158(a)(1).

In particular, "the right of employees to wear union insignia at work has long been recognized as a reasonable and legitimate form of union activity, and the respondent's curtailment of that right is clearly violative of the Act." Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 802 n.7 (1945); accord District Lodge 91, International Ass'n of Machinists and Aerospace Workers, AFL-CIO v. National Labor Relations Board, 814 F.2d 876, 879 (2d Cir. 1987). To overcome this presumption, an employer bears the burden of showing "special circumstances" that justify curtailment of the right. Guard Publishing Co. v. National Labor Relations Board, 571 F.3d 53, 61 (D.C. Cir. 2009); Midstate Telephone Corp. v. National Labor Relations Board, 706 F.2d 401, 403 (2d Cir. 1983). These include "ensuring employee safety, protecting the employer's product, [and] maintaining a certain

employee image (especially with respect to uniformed employees)." Guard Publishing, 571 F.3d at 61.

The ALJ found, and the Board agreed, that allowing pro-union employees to wear multiple buttons did not seriously harm Starbucks's legitimate interest in employee image because "the Company not only countenanced but encouraged employees to wear multiple buttons as part of that image." These other buttons, the Board found, were not immediately recognizable by customers as company-sponsored, and the pro-union pins at issue were "no more conspicuous than the panoply of other buttons employees displayed."

Starbucks contends that the Board's rule permits employees to wear an unlimited number of buttons and would convert them into "personal message boards" and "seriously erode" the information conveyed by Starbucks-issued pins.

We conclude that the Board has gone too far in invalidating Starbucks's one button limitation. As the Board has previously recognized, "Special circumstances justify restrictions on union insignia or apparel when their display may . . . unreasonably interfere with a public image that the employer has established." Starwood Hotels & Resorts Worldwide, Inc., 348 N.L.R.B. 372, 373 (2006) (internal quotation marks omitted). Starbucks is clearly entitled to oblige its employees to wear buttons promoting its products, and the information contained on those buttons is just as much a part of Starbucks's public image as any other aspect of its dress code. But the company is also entitled to avoid the

distraction from its messages that a number of union buttons would risk. The record reveals that one employee attempted to display eight union pins on her pants, shirts, hat, and apron. Wearing such a large number of union buttons would risk serious dilution of the information contained on Starbucks's buttons, and the company has a "legitimate, recognized managerial interest[]" in preventing its employees from doing so. District Lodge 91, 814 F.2d at 880. The company adequately maintains the opportunity to display pro-union sentiment by permitting one, but only one, union button on workplace clothing. Starbucks has met its burden of establishing that the one button restriction is a necessary and appropriate means of protecting its legitimate managerial interest in displaying a particular public image through the messages contained on employee buttons.

C. Agins's Discharge

As noted, Agins was discharged primarily for his use of obscenities in an outburst during an organized protest of Starbucks's restrictive button policy. The Act generally prohibits employers from "discriminat[ing] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3). If a decision to terminate an employee is motivated by that employee's union-related activity, the termination is unlawful.

However, "even when an employee is engaged in protected activity, he or she may lose the protection of the Act by virtue of profane and insubordinate comments." Verizon Wireless, 349 N.L.R.B. 640, 642 (2007). But not all such behavior results in a loss of protection; rather, "employees are permitted some leeway for impulsive behavior when engaging in concerted activity . . . balanced against an employer's right to maintain order and respect in the workplace." Id. (internal quotation marks omitted); accord Caval Tool, 262 F.3d at 192 ("[E]mployees receive some leeway since passions may run high and impulsive behavior is common."). To determine, in some contexts, whether an employee has lost the protection of the Act, the Board considers four factors: "(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice." Atlantic Steel Co., 245 N.L.R.B. 814, 816 (1979).

In this case, the ALJ found that, on balance, these factors favored protecting Agins. She acknowledged that the first factor weighed against protection because the outburst took place in a public area of one of Starbucks's stores, permitting both employees and customers to hear it. The ALJ found that the second factor weighed in favor of protection because the outburst originated out of a discussion that was primarily about the union. The ALJ reached the same conclusion regarding the third factor because the outburst was brief and did not involve threats toward a supervisor.

Finally, the ALJ determined that the fourth factor either weighed in favor of protection or only slightly against it because the comments that elicited Agins's outburst, although not illegal, were provocative. The Board adopted the ALJ's reasoning, as well as her conclusion that Agins's outburst was protected by the Act.

We think the analysis of the ALJ and the Board improperly disregarded the entirely legitimate concern of an employer not to tolerate employee outbursts containing obscenities in the presence of customers. When the Board formulated its four-factor test in Atlantic Steel for determining whether an employee's obscenities would cause the employee to lose the protection of the Act, it was not considering obscenities in a public place in the presence of customers. The context was the workplace, e.g., the factory floor or a backroom office, and the concern was whether the outburst would impair employer discipline. In that context, the Board distinguished between "a spontaneous outburst during the heat of a formal grievance proceeding or in contract negotiations[,]" which would not cause a loss of protection, and "an employee's use of obscenity to a supervisor on the production floor," which would not be protected. Id. at 816. The Board recognized "that even an employee who is engaged in concerted protected activity can, by opprobrious conduct, lose the protection of the Act[,]" id., and then formulated the four factor test to determine "whether the employee has crossed that line, id. (emphasis added). Thus, it is clear that "place," the first of the four factors, serves to

-19-

distinguish outbursts in the presence of other employees from those away from other employees or in the course of grievance proceedings or contract negotiations.  It has nothing to do with public venues where customers are present.  In that context the Atlantic Steel test is inapplicable.

The Board had previously acknowledged that "the language of the shop is not the language of 'polite society.'" Dreis & Krump Mfg., Inc., 221 N.L.R.B. 309, 315 (1975) (emphasis added), enforced, 544 F.2d 320 (7th Cir. 1976).  But even when the Board recognized "some leeway for impulsive behavior" by an employee, it said that that leeway was to be balanced against "an employer's right to maintain order and respect," Piper Realty Co., 313 N.L.R.B. 1289, 1290 (1994), thus indicating that the focus was on workplace outbursts that might undermine an employer's authority, not outbursts in public spaces that risked losing customers.

In the context of outbursts containing obscenities uttered in the workplace, the Board has regularly observed a distinction between outbursts under circumstances where there was little if any risk that other employees heard the obscenities and those where that risk was high. Compare Alcoa, Inc., 352 N.L.R.B. 1222, 1226 (2008) (outburst in grievance meeting; protection maintained), Stanford New York LLC, 344 N.L.R.B. 558, 558-59 (2005) (outburst in employee lunchroom behind closed door in absence of other employees; protection maintained), Felix Industries, 339 N.L.R.B. 195, 195-97 (2003) (outburst in private telephone conversation;

protection maintained), with Verizon Wireless, 349 N.L.R.B. at 642-43 (outburst in office cubicle adjacent to other employees' cubicles; protection lost), DaimlerChrysler Corp., 344 N.L.R.B. 1324, 1329-31 (2005) (outburst in workplace heard by other employees; protection lost), Aluminum Co. of America, 338 N.L.R.B. 20, 21-22 (2002) (outburst in employee breakroom within hearing of other employees; protection lost), Atlantic Steel Co., 245 N.L.R.B. at 816-17 (outburst on production floor; protection lost).

Because we conclude that the Atlantic Steel test is inapplicable to an employee's use of obscenities in the presence of an employer's customers, we face one further issue in this case: whether an employee's outburst in which obscenities are used in the presence of customers loses otherwise available protection if the employee is off duty although on the employer's premises.

On the one hand, it is arguable that section 7 never protects an employee who uses obscenities in the presence of customers, even when discussing employment issues, whether or not the employee is present as an identifiable employee or only as a customer. On the other hand, it is also arguable that section 7 withdraws protection from an employee discussing such issues and using obscenities only when the employee is identifiable by customers as an employee, e.g., in a work uniform. Although an employer has the undoubted right to remove from a store any person, including an employee, who causes a disturbance likely to risk loss of customers, the discharge of an employee has more serious and long-lasting

consequences for the employee than a demand that a customer or an employee leave the premises.

Now that the Board is advised that its <u>Atlantic Steel</u> four-factor test is not applicable to determining section 7 protection for an employee who, while discussing employment issues, utters obscenities in the presence of customers, we think the Board should have the opportunity in the first instance to consider what standard it will apply in that context. Whether it will deny protection to any person who in fact is an employee or only to persons whom the employer reasonably believes customers would reasonably perceive to be an employee, or will develop some other formulation remains to be seen. We simply leave such matters for the Board's consideration in the first instance. Of course, if the Board's standard for the context of customers involves the employer's and the customers' reasonable perceptions concerning an off-duty employee's status as an employee, the Board will also have to make findings as to the relevant facts. Allowing the Board to consider the appropriate standard for the customer context and, if necessary, find the facts concerning reasonable perceptions of the employee as an employee requires a remand.

D. Gross's Discharge

The lawfulness of Gross's discharge implicates dual motivation analysis. "Initially, the General Counsel must establish a prima facie case that protected conduct was a motivating factor in the employer's decision to fire. The burden then shifts to the

employer to show, as an affirmative defense, that the discharge would have occurred in any event and for valid reasons." National Labor Relations Board v. S.E. Nichols, Inc., 862 F.2d 952, 957 (2d Cir. 1988) (internal quotation marks omitted); accord Wright Line, 251 N.L.R.B. 1083, 1089 (1980), as clarified by Director, Office of Workers' Compensation Programs v. Greenwich Collieries, 512 U.S. 267, 276-78 (1994).

With regard to the first step in the analysis, the General Counsel established a prima facie case that Starbucks's discharge of Gross was substantially motivated by Gross's union activity. As noted, it is undisputed that Starbucks unlawfully sought to restrict employee unionization efforts through a number of discriminatory policies. From this, it was reasonable for the ALJ to infer that Starbucks possessed a general anti-union animus. In addition, it is undisputed that the company was aware of Gross's union activities, and it was reasonable for the ALJ to find that Gross's later performance reviews, and in particular the April 29 "Update on Performance," were persuasive evidence of negative animus directed specifically toward Gross for those activities. This sufficed to make out a prima facie case.

The ALJ, however, appears to have misapplied the second step of the burden-shifting analysis. As noted, at that step the issue is whether Starbucks would have fired Gross absent his union

activity. Here, there was strong evidence that it would have done so.

It is undisputed that Gross was, in many respects, a poor employee. Indeed, the ALJ found that "the picture that emerges of Gross' work performance, in general, is one of an employee who worked infrequently, whose primary goal was to organize employees on behalf of the IWW and [who] was otherwise disengaged from the Starbucks employee culture." No Starbucks employee consistently worked as few hours as Gross from May 2005 up to the date of his discharge. In addition, Gross told employees and managers not to perform their assigned tasks, actions which two Members of the Board found were not protected by the Act. Finally, although some of Gross's low evaluation numbers might have been pretextual, many were related to legitimate deficiencies in his performance. In particular, the ALJ found that Gross "did not meet company standards in other areas such as utilizing existing organizational methods to recognize coworkers, training new hires and communicating partner morale issues to store management."

Moreover, the undisputed evidence shows that Gross was placed on notice of many of these deficiencies and did nothing to correct them. First, Gross was placed on notice as early as May of 2005 that he needed to participate in the employee awards program and that he needed to communicate more effectively with management. Despite this notice and repeated remarks to the same effect in subsequent evaluations, Gross never attempted to remedy these deficiencies.

Second, it appears that Gross was aware as early as January 2006 that his low attendance was a problem, yet did little to correct it. Gross's January 29, 2006, performance review stated that he "does not maintain adequate hours of availability," he "has had little exposure to the seasonal lineup" because he "worked only infrequently," and he "has not demonstrated that he has kept up his knowledge of current promotional items." Three months later, Gross's April 27, 2006, "Update on Performance" stated that "[your] inadequate attendance record largely contributed to your inability to demonstrate several of the key responsibilities and core competencies of your barista position" and that he would be terminated if he failed to improve in these areas. Thus, by late January 2006, and at the very latest by April 27, the documented evidence shows that Gross was on notice that Starbucks considered his low availability to be a serious performance issue. Gross, however, made little or no effort to increase his availability.

Despite this evidence of poor performance, the ALJ determined that Starbucks would not have fired Gross absent his union activity because, "[w]hile Gross may not have been a model employee, . . . he was proficient in preparing beverages and customer service[,] . . . [and h]is cash-handling skills were adequate." But an employer is entitled to conclude that preparing coffee drinks and making change does not insulate from discharge an employee who consistently fails to abide by legitimate store employment policies. Gross's documented performance deficiencies provide a sufficient and independent reason to fire him.

-25-

## Conclusion

For the foregoing reasons, we enforce the Board's order only with respect to unfair labor practices not challenged in this Court, grant the cross-petition for review with respect to Starbucks's one button policy and its discharges of Gross, and remand the issue of the discharge of Agins for further proceedings consistent with this opinion. In the event of a subsequent petition for review, jurisdiction will be restored to this panel.

KATZMANN, *Circuit Judge*, concurring:

I concur in the majority's conclusions that Starbucks's decision to discharge Daniel Gross was lawful and that its enforcement of its one button dress code was not an unfair labor practice. I also concur in the majority's decision to remand the issue of Joseph Agins's discharge to the Board for further consideration. I write separately, however, to note my disagreement with the majority's conclusion that the four-part test articulated in *Atlantic Steel Co.*, 245 N.L.R.B. 814 (1979), is not applicable to a situation in which the employee utters a profane word in the presence of customers.

I certainly agree that an employee's use of profanity on store premises in front of customers constitutes serious misconduct, and that an employer may legitimately discipline an employee who engages in such conduct. Indeed, when an outburst takes place in front of customers on store premises, the Board may reasonably conclude that this factor weighs so heavily against protection as to prove essentially dispositive in certain cases.

Nonetheless, with great respect for the majority opinion, it is not clear to me why we must instruct the Board to abandon the *Atlantic Steel* test in its entirety, an outcome urged by neither party in this case. Even if *Atlantic Steel* has heretofore been applied to incidents arising in the workplace outside the presence of customers, it does not necessarily follow that this test was meant to apply only to that circumstance. Indeed, it appears that the presence of customers fits well within the existing framework as an important factor to be considered under the "place of discussion" prong of the *Atlantic Steel* test. Moreover, I am not convinced that the remaining factors become irrelevant simply because the outburst occurred within earshot of customers. In my opinion, the subject matter of the discussion, the nature of the employee's outburst, and whether the outburst was provoked by an employer's unfair labor practice could, in fact, prove

highly relevant in certain situations. A balancing approach, in my view, is a prudent method of resolving these highly fact-specific cases, and I therefore believe that the Board's decision to apply the *Atlantic Steel* test to the facts of this case was eminently reasonable.

But in light of the Court's conclusion that the *Atlantic Steel* test is inapplicable to the facts of this case, I concur in its decision to remand and allow the Board to consider in the first instance the appropriate standard for the customer context and, if necessary, find the additional relevant facts.