18-125(L)
Bozzuto's Inc. v. NLRB

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2018

(Argued: November 29, 2018                    Decided: June 24, 2019)

Docket Nos. 18-125(L), 18-331(XAP)

_____

BOZZUTO'S INC.,

*Petitioner-Cross-Respondent*,

- v. -

NATIONAL LABOR RELATIONS BOARD,

*Respondent-Cross-Petitioner*.

_____

Before: KEARSE, LIVINGSTON, and CARNEY, *Circuit Judges*.

Cross-petition by respondent National Labor Relations Board for enforcement of an order **(A)** holding that petitioner employer engaged in unfair labor practices in violation of the National Labor Relations Act (the "Act"), 29 U.S.C. §§ 158(a)(1) and (3), by, *inter alia*, announcing wage increases in conjunction with

urging employees to decline to join a union, asking one pro-union employee "what's going on with this union stuff," later suspending and then discharging him for allegedly low productivity, and discharging another pro-union employee for insubordination in refusing to attend a meeting; and **(B)** requiring employer to (1) cease and desist from such or similar violations, (2) reinstate the insubordinate employee, (3) compensate and make whole both discharged employees, (4) post the Board's remedial notice listing the employer actions found to have violated the Act, and (5) hold a meeting at which that notice is read aloud to its employees by, or in the presence of, employer's senior vice president. *See Bozzuto's, Inc.*, 365 N.L.R.B. No. 146 (2017).

Employer petitions for review of the Board's holdings that the above single question constituted impermissible interrogation and that the discharges were motivated by antiunion animus, contending that those findings are not supported by substantial evidence; and it contends that the Board abused its discretion in ordering remedies for the discharged employees and ordering that the remedial notice be read aloud at a meeting of employees.

The petition for review is granted to the extent that it challenges (1) the Board's rulings and orders with regard to (a) "interrogation" and (b) the discharge of

2

an employee for insubordination, and (2) the order that the Board's remedial notice be read aloud at a meeting of employees. In all other respects, the petition for review is denied. The Board's cross-petition for enforcement is granted in all respects except those in which the petition for review is granted.

MIGUEL A. ESCALERA, Jr., Hartford, Connecticut (Sheldon D. Myers, Kainen, Escalera & McHale, Hartford, Connecticut, on the brief), *for Petitioner-Cross-Respondent*.

DAVID A. SEID, Washington, D.C. (Peter B. Robb,General Counsel, John W. Kyle, Deputy General Counsel, Linda Dreeben, Deputy Associate General Counsel, Julie Brock Broido, Supervisory Attorney, National Labor Relations Board, Washington, D.C., on the brief), *for Respondent-Cross-Petitioner*.

KEARSE, *Circuit Judge*:

Petitioner-cross-respondent Bozzuto's Inc. ("Bozzuto") petitions for review of so much of an order of respondent-cross-petitioner National Labor Relations Board ("NLRB" or "Board"), *see Bozzuto's, Inc.*, 365 N.L.R.B. No. 146 (2017), as **(A)** found Bozzuto committed unfair labor practices in violation of §§ 8(a)(1) and/or (3) of the National Labor Relations Act (the "Act"), 29 U.S.C. §§ 158(a)(1) and (3), in its treatment of two employees who were union supporters, by asking Todd McCarty "what's going on with this union stuff," later discharging him for allegedly low

productivity, and discharging Patrick Greichen for alleged insubordination in refusing to attend a meeting to which he was summoned by management; and **(B)** orders Bozzuto to reinstate Greichen, to provide Greichen and McCarty with backpay and compensation for other losses, and to read the Board's remedial notice, detailing Bozzuto's violations of the Act, aloud at a meeting of its employees. In support of its petition, Bozzuto contends principally that substantial evidence did not support the Board's findings that the single question to McCarty was coercive or that either McCarty or Greichen was terminated because of antiunion animus or protected activity, and that the Board abused its discretion in ordering Bozzuto to reinstate Greichen with backpay and to read the remedial order aloud to employees.

The Board cross-petitions for enforcement of its order which--in addition to the above aspects challenged by Bozzuto-- found that Bozzuto violated the Act by announcing wage increases in conjunction with urging employees to decline to join a union; by maintaining a restrictive speech policy that conditioned continued employment for suspended employees on their written agreement not to discuss with coworkers terms of employment, including discipline; by disciplining Greichen for talking with other Bozzuto employees about conditions of employment; and by suspending McCarty for supposedly low productivity.

For the reasons that follow, we grant Bozzuto's petition for review to the extent that it challenges (1) the Board's rulings and orders with regard to the "interrogation" of McCarty and the discharge of Greichen, and (2) the order that the Board's remedial notice be read aloud at a meeting of employees. In all other respects, the petition for review is denied. The Board's cross-petition for enforcement is granted in all respects except those in which the petition for review is granted.

# I. BACKGROUND

The observable events leading to these administrative proceedings, despite some vagueness in the testimony as to their precise timing, are largely undisputed. Bozzuto operates wholesale warehouses in Connecticut for the distribution of food products, employing approximately 450 production workers in capacities such as loaders, forklift operators, and "selectors." A selector's job includes receiving orders for food products, driving a motorized vehicle to the section in which the ordered products are stored, and loading the products onto portable platforms that are ultimately carried by truck to the customers.

In order to evaluate selectors' productivity, Bozzuto attaches machine-readable tags to each warehouse product and uses a computerized system to compare the speed with which selectors complete their tasks against a standard time--which the parties call the "labor standard." The labor standards were established by Bozzuto engineers after months of studies, in accordance with accepted engineering methods, calculating average times needed to complete specific tasks. The resulting standards are posted publicly on Bozzuto bulletin boards for the employees' information.

A Bozzuto selector whose performance exceeded the labor standard on a weekly basis became eligible for added incentive pay; a selector whose performance failed, for a given week, to meet at least 95 percent of the labor standard was subject to potential discipline.

McCarty and Greichen were employed at a Bozzuto warehouse as selectors. McCarty had frequently earned extra incentive pay for exceeding the labor standards. In August 2013, Bozzuto posted a commendation for his "outstanding job selecting . . . food products" and his "expertise and dedication to always doing the right job!" (Bozzuto's High Achievers, August 23-25, 2013, "Todd McCarty" ("GREAT JOB, TODD!!!!").)

A. *The events of mid-September through October 1, 2013*

In September 2013, McCarty contacted the United Food and Commercial Workers Union, Local 919 (the "Union"); shortly thereafter, he, Greichen, and two other Bozzuto employees met with a Union representative. On Monday September 23, McCarty and Greichen began handing out union authorization cards to their fellow production workers, urging them to sign up.

The effort to unionize Bozzuto employees did not long remain covert. On September 26, an employee posted a message to Bozzuto's internal electronic message board stating that union authorization cards were being distributed. McCarty had initially hoped the unionization effort would escape management's notice for at least the first few weeks; but it did not, and within the first week he chose to be open about his participation. By September's end, the Union had obtained 84 signed authorization cards from Bozzuto employees.

Bozzuto's management was generally aware in that first week that a union-organizing effort was under way. On Monday September 30, Bozzuto's Vice President of Human Resources Carl Koch posted a message stating that Bozzuto was "aware of the current activity."

7

On or about October 1, as McCarty exited a restroom near a Bozzuto work area, he encountered Bozzuto's Senior Vice President Rick Clark, with whom he had a good relationship. Clark asked, "Hey, Todd, what's going on with this Union stuff?" McCarty replied, "I'm not going to talk about it with you, Mr. Clark." (Hearing Transcript ("Tr.") 485.) That was the end of the conversation.

On October 1, Bozzuto issued a written announcement that stated in pertinent part as follows:

> We have been advised by a number of our associates that the [Union] is attempting to unionize our associates and asked them to sign a union card. The associates that came to us did so out of concern for themselves and their fellow workers stating that having a union is not in the best interest of Bozzuto[] or the associates.
>
> . . . .
>
> We want all of our associates to understand that they are not required to sign a union card. ***It's absolutely ok to say NO.*** If anyone harasses you about that, tell them to stop and feel free to seek our assistance.
>
> We do not need a union at Bozzuto[]. Unions do not provide jobs, only successful companies can . . . .

(Emphasis in original.) On the same day, Bozzuto posted a memorandum announcing that nearly all production workers would be receiving hourly pay

increases ranging from 50 cents to two dollars per hour, retroactive to September 29, 2013.

Also on October 1, 2013, Greichen was summoned to a meeting with several members of Bozzuto's management team: Senior Vice President Clark, Human Resources Vice President Koch, Associate Relations and Development Manager Doug Vaughan, and Head of Security Bill Glass. Bozzuto maintains that the meeting was called because Clark had been told by other employees that Greichen was displaying erratic behavior and making various negative comments about Bozzuto's labor standards being too stringent, complaining that they did not, in Greichen's view, allow enough time for employees to complete their assigned tasks. As reflected in a memorandum prepared by Vaughan from his notes of the meeting, Clark informed Greichen "that several associates" had "commented on how his behavior had been increasingly more erratic and some hourly associates considered his behavior 'scary,'" and that "it was management's job to provide a safe and clean work environment for all associates" and to address "comments . . . made to management that raise a red flag."

Greichen was warned against continuing his behavior and told he "needed to stop disrupting the work environment by making negative comments in

9

the aisles, such as[] being forced to work 20 hours per day or comments about needing three legs to do the work here, in the hallway in front of his peers."

B. *The Discharge of Greichen on October 8*

On October 8, 2013, Greichen complained first to his supervisors, and thereafter to Bozzuto's then-Grocery Distribution Manager Jason Winans, that the labor standard pertaining to his assigned tasks for the day had been unfairly shortened, making timely completion of his work impossible. Winans's ensuing memorandum summarizing his conversation with Greichen stated that Winans "attempt[ed] to calm Mr. Greichen down" by reviewing with him the computer records as to individual assignments; but when Winans "didn't see anything out of the ordinary,"

> Patrick [Greichen] began telling me how he believes Bozzuto[] cuts the standard time on assignments on days when the volume is high in order to get more cases out of people and to pay them less, in the process making them miserable. *Patrick then told me that he tells anybody and everybody he can that he believes we are purposely changing the standards on a daily basis in order to screw the associates.* I told Patrick that I didn't believe any of this to be true and that these were very serious accusations he was making.

(Memorandum of Jason Winans dated October 9, 2013, as to October 8, 2013

10

accusations by Patrick Greichen ("Winans Memorandum of Greichen's October 8 statements") at 1 (emphases added)).  As indicated in that memorandum, Winans viewed the situation as problematic, and he promptly reported Greichen's accusations to Clark and Vaughan.

Clark and Winans arranged for a 4:00 meeting on October 8 at which Bozzuto industrial engineers James Wright and David Heatley could explain to Greichen how the standard times for various tasks were determined and functioned so that Greichen could see that the targets were not subject to manipulation.  Bozzuto maintains that it hoped both to educate and reassure Greichen and to prevent him from spreading misinformation to other employees.

Winans then, as instructed by Clark, told Greichen of the scheduling of the meeting and its purpose, and said Greichen's presence was required.  Despite Winans's repeated urging, Greichen refused to attend.  He said he felt he was being harassed.  Vaughan then joined Winans in attempting to persuade Greichen to attend the meeting.  Vaughan said Greichen would not face discrimination or harassment or "anything negative" if he attended the meeting; Winans emphasized that the meeting was mandatory and that if Greichen did not attend, he would be suspended pending termination for insubordination.  Greichen confirmed that he understood.

There is no dispute that he was also informed the meeting would be attended by industrial engineers.

Greichen nonetheless refused to attend. Bozzuto discharged him, effective that day, citing his insubordination.

C. *The 2014 Suspension and Termination of McCarty*

Following the October 8, 2013 discharge of Greichen, McCarty remained involved in supporting the union-organizing effort and was one of the few remaining active union supporters. His involvement with the Union had been well known to Bozzuto's management since the first week of the campaign.

In early January 2014, McCarty became aware that his reported productivity numbers for the week ending January 4 appeared to be unduly low, and he deduced that Bozzuto's computerized reporting system, in tracking his efficiency as compared to the labor standard, had failed to take account of his "down time," *i.e.,* time when he properly was not on-the-clock. Down time, such as a supervisor-approved break or time needed for equipment repairs, does not count toward the total time the employee has taken to complete a task. Thus, failure to account for an

employee's down time would make his performance appear to be less productive than it actually was.

To verify his suspicion that the reporting system was not taking proper account of his down time, McCarty began to take screen shots each week of the raw data shown for him in the computer, in order to prove inaccuracies in the final productivity reports. He complained to Winans about the discrepancies he observed due to his missing down time. According to McCarty, Winans essentially disregarded his complaint, saying "If you wanted down time put in, you should have made sure it was put in. . . . It is what it is." (Tr. 515.)

In mid-January, McCarty spoke with his supervisor William Englehart to pursue his complaint about improper treatment of his down time. According to McCarty, Englehart told him not to worry about it (*see id*. at 516); but Bozzuto proceeded to suspend McCarty for five days on account of his supposedly low productivity numbers. McCarty refused to sign the Bozzuto write-up documenting this five-day suspension, arguing that the productivity numbers shown were inaccurate.

McCarty then was away for a few weeks, in part on vacation, and he had coworkers take screen shots of his data for the week ending January 18. Their

photographs showed that McCarty's originally recorded down time was thereafter deleted, thereby lowering McCarty's productivity score.

On February 18, the day that McCarty returned, he was summoned to a meeting with members of Bozzuto's management. He was told that his performance for the week of January 11 was at 94 percent of the labor standard, and that, as a result, he was being discharged. McCarty objected on the ground that the productivity numbers were skewed, and he refused to sign the write-up documenting his termination.

Shortly after his suspension, McCarty had contacted the NLRB Regional Office and had begun submitting his photographic evidence of the alterations relating to his productivity. On April 9, 2014, that Office sent Bozzuto a letter stating that McCarty's productivity data had been altered, and attached, *inter alia*, photographs for each of the weeks ending January 11 and 18, 2014, showing the records for McCarty before and after the alterations took place.

McCarty had not submitted his photographic evidence to Bozzuto. After receiving the April 9 communication from the NLRB, Bozzuto initiated an internal investigation, led by industrial engineer Wright. As a result of this investigation, Bozzuto concluded on April 14, 2014, that McCarty's data had in fact been changed--

14

adversely to McCarty--with respect to the weeks ending January 11 and January 18. On May 14, 2014, it unconditionally offered McCarty reinstatement, plus compensation for losses in earnings and benefits. McCarty declined reinstatement.

D. *The Administrative Proceedings*

In October 2014, the NLRB's General Counsel, through its Regional Director (collectively the "General Counsel"), issued a complaint alleging that Bozzuto had violated §§ 8(a)(1) and/or (3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3), by--to the extent pertinent to the present petitions--(1) interrogating McCarty on or about September 27, 2013; (2) implementing a work rule that prohibited disciplined employees from discussing the terms of their employment, including disciplinary measures, with other employees; (3) raising wages on October 1 in an attempt to discourage employees from joining the Union; (4) warning Greichen on October 1 against engaging in activity protected by the Act; (5) discharging Greichen on October 8 in retaliation for his previous conduct that was protected by the Act; and (6) suspending and discharging McCarty because of the company's antiunion animus.

The matter was tried before administrative law judge ("ALJ") Raymond P. Green, who found against Bozzuto on each of the above charges and principally

15

recommended the issuance of cease-and-desist orders and affirmative relief for Greichen and McCarty.

1. *The Rulings and Recommendations of the ALJ*

First, the ALJ considered Bozzuto's October 1, 2013 announcement of retroactive pay raises for most of its production workers. There was clear evidence that management had become aware of the union-organizing activity several days earlier. The ALJ also noted an absence of evidence that such increases were given on a regular basis or that the decision to implement these increases had been made before Bozzuto became aware of the union- organizing activity. On the same day that Bozzuto announced the pay raises, it announced that it "was aware that the Union had obtained a list of the warehouse employees," and it "encouraged employees to refrain from signing union authorization cards and stated that 'we do not need a union at Bozzuto[] . . . .'" 365 N.L.R.B. No. 146, slip op. at 15. The ALJ found that "[t]he notices *posted simultaneously* on October 1, 2013, leave no doubt that the pay increases were motivated by the fact that the Company became aware that the Union was engaged in organizing activity," and that the announcement of the raises violated § 8(a)(1) of the Act. *Id*. at 16 (emphasis added).

16

As to Bozzuto's treatment of Greichen on October 1, the ALJ found that summoning him to a meeting and criticizing him because of employee reports that he was complaining to other workers about how the production standards were resulting in long hours and affecting, *inter alia*, their rights to receive premium pay, interfered with Greichen's protected right to engage in concerted activity within the meaning of § 7 of the Act. *See id*. at 16-17; *see also id*. at 17 (finding that the warning of Greichen "at virtually the same time that the Company notified employees that they should avoid union activity" suggests that "management more than likely believed that he was among the employees who most likely would support a union"). The ALJ also found that Bozzuto's general policy of conditioning continued employment for suspended employees on their agreement not to discuss terms of employment, including discipline, with their coworkers (Bozzuto's "restrictive speech policy") violated § 8(a)(1) of the Act.

As to Clark's asking McCarty "what's going on with this union stuff," the ALJ found as follows:

> While this single act of interrogation might be viewed as an offhand and somewhat innocuous comment, the fact is that this event occurred *at or near* the same time of the *unlawfully motivated pay increase and the unlawful discrimination against Greichen*. I

17

therefore shall conclude that this interrogation, in the circumstances, violated Section 8(a)(1) of the Act.

365 N.L.R.B. No. 146, slip op. at 18 (emphases added).

The ALJ also found that the discharge of Greichen on October 8 violated the Act, rejecting Bozzuto's contention that he had been discharged solely for insubordination:

Even taking [Bozzuto's] premise that Greichen's refusal to attend a meeting constituted insubordination, . . . . Greichen was told to go to a meeting to discuss his complaints about productivity standards because [Bozzuto] was concerned that he was talking about them *and misinforming* his fellow employees. *Thus, the demand that he attend this meeting was inexplicably [sic] bound up to the Company's earlier unlawful warning on October 1, which was issued because of Greichen's protected concerted activity*. One follows from the other and *the October 8 meeting would not have taken place but for the earlier interference with Greichen's right to talk to his coworkers* about their collective terms and conditions of employment.

*Id*. at 17 (emphases added).

Finally, the ALJ found that Bozzuto's suspension and discharge of McCarty in 2014 were motivated by antiunion animus, noting "that McCarty was the leading union activist among the employees after October 8," that Bozzuto "was fully aware of his union activity," and that "the ostensible reason for his suspension and discharge was manifestly false." *Id*. at 18; *see also id*. (noting that Bozzuto "ha[d] failed

to show that it would have taken these actions apart from McCarty's union activity"). The ALJ concluded that the General Counsel had established by a preponderance of the evidence that Bozzuto's suspension and discharge of McCarty violated §§ 8(a)(1) and (3) of the Act.

In light of his findings as to these violations, the ALJ recommended that Bozzuto be ordered to cease and desist from such conduct, that it offer reinstatement to Greichen and take affirmative steps to make Greichen and McCarty whole for any losses resulting from Bozzuto's violations of their rights, and that it post notice of the Board's findings and remedial order.

However, the ALJ rejected the General Counsel's request for a recommendation that Bozzuto be ordered to read such an order aloud to its assembled employees. The ALJ recognized that such a public reading is an "'extraordinary remed[y],'" 365 N.L.R.B. No. 146, slip op. at 19 (quoting *Federated Logistics & Operations*, 340 N.L.R.B. 255, 256-57 (2003)). And while noting that Bozzuto's violations were not trivial, the ALJ concluded that they were "not . . . numerous, pervasive or outrageous," and there had been no showing that Bozzuto had violated the Act in the past or that it was likely to do so again in the future. 365 N.L.R.B. No. 146, slip op. at 19.

2. *The Decision of the Board*

A three-member panel of the Board unanimously adopted the ALJ's findings that Bozzuto engaged in unfair labor practices on October 1, 2013, in its announcement of wage increases and its restrictive speech policy--findings to which Bozzuto had not objected--and in 2014 by suspending and discharging McCarty. As discussed below, the ALJ's other findings were adopted by a 2-1 vote of the Board, with the Chairman dissenting principally from the findings that Bozzuto violated the Act in questioning McCarty (*see* Part II.B.1. below) and in discharging Greichen (*see* Part II.C. below). The Board also, by a 2-1 vote with the Chairman dissenting, modified the ALJ's recommended remedy by requiring that the Board's remedial notice be read aloud at a meeting of employees by Clark or by a Board member in Clark's presence (*see* Part II.D. below).

# II. DISCUSSION

Bozzuto in its petition for review contends principally (A) that substantial evidence does not support the Board's findings that Clark's single question to McCarty constituted an unlawful interrogation or that Bozzuto's

discharges of Greichen and McCarty were either punishment for statutorily protected activity or motivated by antiunion animus; and (B) that neither Bozzuto's conduct nor its history warrants the extraordinary remedy of ordering that the Board's remedial notice be read aloud to Bozzuto's employees.

The Board petitions for enforcement of its findings in full, either for lack of timely objection by Bozzuto, or on the merits, *i.e.*, contending

■ that its decision upholding two findings and recommendations of the ALJ--that Bozzuto violated § 8(a)(1) of the Act (a) by announcing and implementing wage increases in response to the union-organizing activity, and (b) by its restrictive speech policy conditioning continued employment for disciplined employees on their refraining from discussing their discipline, etc., with coworkers--should be summarily enforced because Bozzuto did not object to those ALJ findings before the Board, *see* 29 U.S.C. § 160(e) (absent extraordinary circumstances, "[n]o objection that has not been urged before the Board . . . shall be considered by the court");

■ that two other Board findings--that Bozzuto violated § 8(a)(1) of the Act by warning Greichen not to discuss the terms of his employment with other Bozzuto employees (a finding that Bozzuto no longer challenges (*see* Bozzuto reply brief in support of petition for review at 7-8)), and violated §§ 8(a)(1) and (3) by suspending McCarty--should be summarily enforced because Bozzuto's opening brief contains no challenges to those findings or the related orders, *see, e.g.*, Fed. R. App. P. 28(a)(8)(A) ("appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); and

21

■ that the Board's findings that Bozzuto violated § 8(a)(1) by interrogating McCarty and discharging Greichen, and violated §§ 8(a)(1) and (3) by discharging McCarty, are supported by substantial evidence.

The Board seeks enforcement of its entire remedial order, including the requirement of a public reading of the findings and the order to Bozzuto's employees, as within its broad discretion.

In light of 29 U.S.C. § 160(e) and Fed. R. App. P. 28(a)(8)(A), the findings and orders that Bozzuto did not timely challenge will be summarily enforced.

For the reasons that follow, we grant Bozzuto's petition with respect to the questioning of McCarty and the discharge of Greichen, and the remedial orders associated with those rulings, and with respect to the order that the Board's remedial notice be read aloud to Bozzuto employees. In all other respects, we grant the Board's petition for enforcement.

A. *The National Labor Relations Act*

Section 7 of the Act provides, as a fundamental matter, that employees of an employer covered by the Act

shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other

22

concerted activities for the purpose of collective bargaining or other mutual aid or protection.

29 U.S.C. § 157.  Section 8(a) of the Act provides, in pertinent part, that "[i]t shall be an unfair labor practice for an employer--

> (1) *to interfere with*, restrain, *or coerce* employees *in the exercise of the rights guaranteed in section 157* of [Title 29 U.S.C.],

29 U.S.C. § 158(a)(1) (emphases added), or

> (3) by discrimination in regard to hire *or tenure of employment* or any term or condition of employment to encourage or *discourage membership in any labor organization*,

29 U.S.C. § 158(a)(3) (emphases added).

1. *Discipline and Discharge*

An employer violates §§ 8(a)(1) and (3) of the Act by disciplining or discharging an employee for engaging in union activity or other section 7 conduct. *See, e.g., NLRB v. Transportation Management Corp.*, 462 U.S. 393, 397-98 (1983) ("*Transportation Management*"), *abrogated on other grounds by Director, Office of Workers' Compensation Programs v. Greenwich Collieries*, 512 U.S. 267, 276-78 (1994).  "Under these provisions it is undisputed that if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, *or if the reasons*

23

*that he proffers are pretextual*, the employer commits an unfair labor practice."

*Transportation Management*, 462 U.S. at 398 (emphasis added).

However, while the Act "makes unlawful the discharge of a worker because of union activity, . . . employers retain the right to discharge workers for any number of other reasons unrelated to the employee's union activities." *Id*. at 394. An employer "does not violate the NLRA . . . if any anti-union animus that he might have entertained did not contribute at all to an otherwise lawful discharge for good cause." *Id*. at 398. For example, "insubordination, disobedience or disloyalty is adequate cause for discharge . . . ." *NLRB v. Local Union No. 1229, International Brotherhood of Electrical Workers*, 346 U.S. 464, 475 (1953). And the Act expressly provides that

> [n]o order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause.

29 U.S.C. § 160(c).

When the General Counsel files a complaint alleging that an employee was discharged because of his union activities and the employer counters that it had an unrelated, legitimate motive for its decision, "*Wright Line* analysis" is applied, *see Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*

455 U.S. 989 (1982); *Transportation Management*, 462 U.S. at 404. Under *Wright Line* analysis, the initial question is whether the General Counsel has carried his "burden of persuading the Board that an anti-union animus contributed to the employer's decision to discharge [the] employee, a burden that does not shift"; but if that burden has been carried, "the employer, even if it failed to meet or neutralize the General Counsel's showing, c[an] avoid the finding that it violated the statute by demonstrating by a preponderance of the evidence that the worker would have been fired even if he had not been involved with the Union." *Id*. at 395; *see id*. at 401-02 (deferring to the Board's interpretation of the Act as designating the employer's assertion of a purely union-unrelated motive "as an affirmative defense that the employer has the burden of sustaining"). In effect, under this sequence, "'[i]nitially, the General Counsel must establish a prima facie case that protected conduct was a motivating factor in the employer's decision to fire. The burden then shifts to the employer to show, as an affirmative defense, that the discharge would have occurred in any event and for valid reasons.'" *NLRB v. Starbucks Corp.*, 679 F.3d 70, 80 (2d Cir. 2012) (quoting *NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952, 957 (2d Cir. 1988) ("*S.E. Nichols*") (other internal quotation marks omitted), *cert. denied*, 490 U.S. 1108 (1989)).

"[T]he Board may infer [an employer's] discriminatory motive from circumstantial evidence," *Abbey's Transportation Services, Inc. v. NLRB*, 837 F.2d 575, 579 (2d Cir. 1988); *see also NLRB v. Windsor Industries, Inc.*, 730 F.2d 860, 863 (2d Cir. 1984), which may include the employer's "knowledge of the employees' union activities," the timing of the discharge, or other antiunion activity by the employer, *S.E. Nichols*, 862 F.2d at 957.

2. *Interrogation*

While § 8(a)(1) of the Act prohibits interference with, *inter alia*, an employee's interest in joining a union, employers nonetheless have a First Amendment right to engage in communications with employees about union activity, *see*, *e.g.*, *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969); such communications do not constitute unfair labor practices so long as they "contain[] no threat of reprisal or force or promise of benefit," 29 U.S.C. § 158(c); *see*, *e.g.*, *NLRB v. Montgomery Ward & Co.*, 192 F.2d 160, 163 (2d Cir. 1951) ("inquiries made by [a] manager concerning what was being done in behalf of the union"-- even in conjunction with "statements as to his not liking the union"--were not unlawful "to the extent that they constituted no

threat or intimidation, or promise of favor or benefit in return for resistance to the union").

An employer's questioning of an employee will, however, amount to a violation of § 8(a)(1) if "either the words themselves or the context in which they are used . . . suggest an element of coercion or interference." *Rossmore House*, 269 N.L.R.B. 1176, 1177 (1984) (internal quotation marks omitted), *enforced sub nom. Hotel Employees Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985). But "'the realities of the workplace'" require recognition that

> "[b]ecause production supervisors and employees often work closely together, one can expect that during the course of the workday they will discuss a range of subjects of mutual interest, including ongoing unionization efforts."

*Rossmore House*, 269 N.L.R.B. at 1177 (quoting *Graham Architectural Products v. NLRB*, 697 F.2d 534, 541 (3d Cir. 1983) ("*Graham*")). "'To hold that any'" and every "'instance of casual questioning concerning union sympathies violates the Act'" would thus "'ignore[] the realities.'" *Rossmore House*, 269 N.L.R.B. at 1177 (quoting *Graham*).

Accordingly, an interrogation that is "not itself threatening[] is not held to be an unfair labor practice unless it meets certain fairly severe standards," *Bourne v. NLRB*, 332 F.2d 47, 48 (2d Cir. 1964) ("*Bourne*"). The factors to be considered in

determining whether questioning is threatening or coercive include

> (1) The background, i.e., is there a history of employer hostility and discrimination?

> (2) The nature of the information sought, e.g., did the interrogator appear to be seeking information on which to base taking action against individual employees?

> (3) The identity of the questioner, i.e., how high was he in the company hierarchy?

> (4) Place and method of interrogation, e.g., was employee called from work to the boss's office? Was there an atmosphere of 'unnatural formality'?

> (5) Truthfulness of the reply.

*Id.*; *see, e.g., Rossmore House*, 269 N.L.R.B. at 1178 n.20 (considering the above *Bourne* factors); *Regal Recycling, Inc.*, 329 N.L.R.B. 355, 365 (1999) (deeming employer's inquiries coercive in part because employees gave false answers or failed to respond); *Town & Country Supermarkets*, 340 N.L.R.B. 1410, 1423-24 (2004) (deeming employer's inquiries coercive in part because employee gave responses that were evasive); *see also Vista Del Sol Health Services, Inc.*, 363 N.L.R.B. No. 135, slip op. at 17 (2016) (considering also "the timing of the interrogation and whether the interrogated employees are open and active union supporters"); *Gardner Engineering, Inc.*, 313 N.L.R.B. 755, 755 (1994) (deeming employer questions coercive in part because the

employee was not "an open and active union supporter at the time of the interrogation"), *enforced as modified on other grounds*, 115 F.3d 636 (9th Cir. 1997).

In sum, the *Bourne* factors "are not to be mechanically applied," *Rossmore House*, 269 N.L.R.B. at 1178 n.20; and in order to determine whether questioning constituted an unfair labor practice, the Board assesses the "totality of the circumstances," *i.e.*, it considers "whether under all the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act," *id*. at 1178 & n.20.

3.  *Standards of Decision*

Section 10(c) of the Act requires that the Board hear evidence on claims of unfair labor practices and grant relief if it finds such claims established by a "preponderance" of the evidence.  29 U.S.C. § 160(c).  Sections 10(e) and 10(f) of the Act, 29 U.S.C. §§ 160(e) and (f), allow petitions to the relevant court of appeals by, respectively, the Board for enforcement of its order and the respondent in opposition. Each of those sections provides that on such review, the "findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall" "be conclusive," 29 U.S.C. §§ 160(e) and (f).  In this

respect,

> [s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . Accordingly, it must do more than create a suspicion of the existence of the fact to be established.

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation marks omitted).

Further, proper assessment of "[t]he substantiality of evidence *must take into account whatever in the record fairly detracts from its weight*." *Id*. at 488 (emphasis added). However, when choosing between "two fairly conflicting views," we will not overturn the Board's fact finding, even if we would have come to "a different choice had the matter been before [us] de novo." *NLRB v. G & T Terminal Packaging Co.*, 246 F.3d 103, 114 (2d Cir. 2001) (internal quotation marks omitted). "[R]eversal based upon a factual question will only be warranted if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by the Board." *NLRB v. Katz's Delicatessen of Houston Street, Inc.*, 80 F.3d 755, 763 (2d Cir. 1996) (internal quotation marks omitted).

We review the Board's conclusions of law "to ensure that they have a reasonable basis," and in so doing, we "afford the Board a degree of legal leeway."

*NLRB v. Caval Tool Division*, 262 F.3d 184, 188 (2d Cir. 2001) (internal quotation marks omitted). We "will uphold the Board's legal determinations 'if not arbitrary and capricious.'" *NLRB v. Consolidated Bus Transit, Inc.*, 577 F.3d 467, 474 (2d Cir. 2009) ("*Consolidated Bus*") (quoting *Cibao Meat Products, Inc. v. NLRB*, 547 F.3d 336, 339 (2d Cir. 2008)).

B. *McCarty*

Bozzuto challenges the Board's rulings that (1) Clark's single question to McCarty, and (2) the 2014 discharge of McCarty, violated the Act. We find merit in the first challenge, but not the second.

1. *Interrogation*

The ALJ noted that Clark's "what's going on with this union stuff" question to McCarty, was a "single act of interrogation [that] might be viewed as an offhand and somewhat innocuous comment"; but he found that it violated § 8(a)(1) simply because it "occurred at or near the same time of the unlawfully motivated pay increase and the unlawful discrimination against Greichen." 365 N.L.R.B. No. 146, slip op. at 18. The Board majority, after considering, *inter alia*, *Rossmore House* and the

31

*Bourne* factors and the totality of the circumstances, *see id*. at 2-3, agreed with the ALJ.

It stated as follows:

> Clark was a high-ranking official; he initiated a conversation in which he questioned an active, but not yet open, union supporter; McCarty . . . did not answer Clark's question; and the inquiry occurred at or near the same time as [Bozzuto's] unlawful discrimination against union supporter Patrick Greichen, including his disciplinary warning and discharge, and its unlawfully motivated pay increase to employees.

*Id*. at 2 (footnotes omitted). The majority also found that "despite McCarty's 'good relationship' with Clark, it is telling that McCarty did not feel comfortable telling Clark 'what was going on' with the organizing campaign." *Id*. at 2 n.6.

The Board Chairman, dissenting--also considering *Rossmore House* and the *Bourne* factors and the totality of the circumstances, *see id*. at 7-9--disagreed, concluding that only one *Bourne* factor, the fact that Clark was an officer, was any indicator of coercion, *see id*. at 8. The dissent noted, *inter alia*, that McCarty was known to Bozzuto management to be a union supporter, and that "Clark's question was no more objectionable than the manager's question found lawful in *Rossmore House* itself ('What is this about a union?'), and it was clearly *less* intrusive than the owner's inquiry also found lawful in *Rossmore House*, where the owner asked an

employee *why* he was 'trying to get a union in here.'" *Id*. at 8 n.7 (quoting *Rossmore House*, 269 N.L.R.B. at 1178) (emphases in dissent)).

Our review of the record persuades us that some of the majority's findings with regard to the Clark question are not supported by the record as a whole. First, neither the record nor certain other findings made by the majority support its view that Clark's question was coercive in part because it was asked when McCarty was "not yet [an] open[] union supporter." 365 N.L.R.B. No. 146, slip op. at 2. While the General Counsel's complaint had alleged that Clark's question to McCarty occurred on September 27, the Board majority refused to accept that date, stating that "the record and the judge's decision as a whole indicate that it occurred about October 1." *Id*. at 1 n.5. Yet the majority found that "the campaign began on Monday, September 23," *id*. at 2 n.5; that Bozzuto's "management became aware of McCarty's involvement from another employee early in the organizing campaign," *id*. at 2 n.10; *see, e.g., id*. at 1 n.4 ("[t]he record shows that sometime before October 1, an employee told . . . Clark[] of McCarty's involvement in the organization efforts"); and that McCarty himself testified that "'*within that first week I was not secret about [the union campaign] at all*,'" *id*. at 2 n.10 (quoting Tr. 693 (emphasis ours)). The majority's view that "this testimony"--by McCarty himself--"does not establish that McCarty was

33

open *at the time of the interrogation*," 365 N.L.R.B. No. 146, slip op. at 2 n.10 (emphasis added), is at odds with the fact that the Union campaign began on September 23 and the majority's own insistence that the interrogation occurred on October 1, which was the ninth day of the campaign. And while the majority was entitled to its view that management's "aware[ness] of McCarty's involvement from another employee early in the organizing campaign" did not necessarily "equate[] to openness on McCarty's part," *id*., the majority's refusal to accept as true McCarty's own statement that he became open--'"not secret . . . at all'"--'"within that first week,'" *id*. (quoting Tr. 693), strikes us as arbitrary and capricious. The majority's view that "the record does not support the conclusion that McCarty was an open union supporter *at the time of the interrogation*," 365 N.L.R.B. No. 146, slip op. at 2 (emphasis in original), is itself contradicted by the record.

Second, the generality of Clark's question did not suggest that management sought to identify or discipline employees because they were union sympathizers; it was no more intrusive than the question asked by the manager in *Rossmore House*, "What is this about a union," which was found not to violate the Act. The majority, without attempting any explanation as to why the language of Clark's question, "what's going on with this union stuff," was in any way significantly

34

different, cited the fact that the employer in *Rossmore House* "had not" committed any unfair labor practices before the questioning occurred. *See* 365 N.L.R.B. No. 146, slip op. at 3 n.11. But it is hardly clear that this was not also true of the present case. The only unfair labor practices by Bozzuto in the fall of 2013 that are sustained here occurred on October 1: the pay raise, the restrictive speech policy of continuing to employ suspended employees only if they would agree not to discuss their discipline, etc., with coworkers, and the warning to Greichen to stop talking to his coworkers about conditions of employment. If the majority was correct in its finding that McCarty was not an open union supporter at the time of Clark's question, that question would had to have been asked prior to September 30; and at that time Bozzuto--indistinguishably from employer in *Rossmore House*--would not have committed any prior unfair labor practice.

We also note that McCarty testified that the Clark question occurred in the second week of the Union campaign (*see* Tr. 485). The campaign had begun on Monday September 23. While the majority stated that "[i]t goes without saying that the week after the September 23 start date of the campaign was *the week of October 1*," 365 N.L.R.B. No. 146, slip op. at 2 n.5 (emphasis added)--a convenient date because that was the date on which there were confirmable unfair labor practices--in fact that

35

second week began on Monday September 30, a date that itself may, consistent with McCarty's testimony, have been the day of Clark's question. September 30, however, was prior to Bozzuto's commission of any unfair labor practice.

Further, we do not find that the record supports the majority's view that McCarty's response to Clark's question indicates that the question was coercive on the basis that "McCarty did not feel comfortable telling Clark 'what was going on' with the organizing campaign," *id*. at 2 n.6. As the Board has noted in the past, "[i]t is actually none of [management's] lawful business as to [an employee's] evaluation of union activities," *Medical Center of Ocean County*, 315 N.L.R.B. 1150, 1154 (1994) ("*Medical Center*"), and McCarty's response apparently so recognized. While the majority again saw this case as different from *Rossmore House*, stating that the employee there "responded to the inquiry ['What is this about a union,'] candidly and without hesitation," 365 N.L.R.B. No. 146, slip op. at 3 n.11, the record here contains no indication that McCarty had any hesitance whatever in saying "I'm not going to talk about it with you, Mr. Clark" (Tr. 485). That answer provided no information that was responsive to the question, but it also evinced no discomfort in telling Clark, in a most civil way, that the union activity was none of Clark's lawful business. McCarty's response cannot be viewed as an indicium of coercion.

36

We conclude, as did the dissent, that the record supports the conclusion that all of the *Bourne* factors, except Clark's position as a company officer, point toward a finding that Clark's question was not coercive and did not violate the Act. There is no evidence in the record as to any history whatever prior to this union-organizing effort of any animosity of Bozzuto toward unions. Indeed, the ALJ expressly found that Bozzuto had not violated the Act in the past (and he saw no indication that it was likely to do so in the future). *See* 365 N.L.R.B. No. 146, slip op. at 19. The question was asked by Clark during a chance encounter as McCarty was leaving a restroom. It was asked of an employee who was, by then, an open supporter of the union. The question was entirely general, the sort of question that might pass between any two employees, regardless of rank; it did not ask about individuals, and it carried no portent of discipline. It produced McCarty's direct response that he would not discuss the matter with Clark. And no further questions were asked.

The Board majority in finding Clark's question coercive cited nearly two dozen cases. All of the cases in which a question was found to be coercive involved either supervisors calling employees into their offices for closed-door exploration of the identities of union supporters, or repeated or insistent questioning, or threats of

37

discipline, or imposition of more severe working conditions, or threats to close or move the company, or a backdrop of numerous unfair labor practices. *See*, *e.g.*, *Seton Co.*, 332 N.L.R.B. 979, 981-82 (2000) (in questioning that took place "against a background of numerous other unfair labor practices including threats of plant closure . . . and more onerous working conditions," supervisor interrogated employee as to whether he had been "talking about the Union" and threatened the employee that "if he was caught talking about the Union he could be fired"); *Acme Bus Corp.*, 320 N.L.R.B. 458, 461, 478 (1995) (for several months, supervisor "spent about 45 minutes of every 2 hours . . . speaking to employees regarding the Union," asking, *inter alia*, as directed by upper management, "whether the[ employees] supported the Union," and "where union meetings would be held," and reported back to management on his findings); *Management Consulting, Inc.*, 349 N.L.R.B. 249, 258 (2007) (manager called an employee into his office and asked the employee a series of questions as to his union activity and that of his fellow employees); *Medical Center*, 315 N.L.R.B. at 1154 (supervisor called employee, who was not an open union supporter, "into his office and closed the door" and asked employee about union activity; employee had worked at this company for 10 years and had "never worked with [that supervisor] . . . and had never been called into an office for a conversation with his supervisor where the

door was closed"). Not one of the cases relied on by the majority found the Act violated in circumstances paralleling those here: a single very general question, asked in a chance encounter, by a supervisor whose company had no history of union animosity, where the question was met with a simple and forthright refusal to discuss, was not followed by any questions to McCarty or any other employee, and was not accompanied by pervasive unlawful conduct as occurred in the cases cited by the Board majority.

In these circumstances, which fall far short of meeting the "fairly severe standards" needed to constitute an unfair labor practice, *Bourne*, 332 F.2d at 48, the Board's finding instead comes close to creating a *per se* rule that no manager can, without committing an unfair labor practice, ask an employee any question about ongoing union activity. We conclude that the Board's finding that Bozzuto unlawfully interrogated McCarty is not supported by the record as a whole.

2. *McCarty's Discharge*

In contrast, we reject, without a need for extended discussion, Bozzuto's challenge to the finding that it violated the Act by terminating McCarty's employment in February 2014. The record is clear that Bozzuto told McCarty he was being

discharged because of low productivity, and that the basis for that assessment was data that, although originally entered correctly in the company's computer system, had thereafter been altered to decrease McCarty's perceived level of productivity. Bozzuto's own eventual internal investigation in April 2014 confirmed that McCarty's data had been so altered.

Bozzuto's contention that, despite the fact that the alterations had been made using a supervisor's access code, its internal investigation was unable, because of the company's lax security, to establish "conclusively" who made those alterations (Bozzuto reply brief in support of petition for review at 26), and hence that the alterations themselves should not be attributed to management--even if it were sustainable--is of no moment. The fact remains that Bozzuto discharged McCarty on the basis of fraudulent data.

Bozzuto's contention that its discharge of McCarty did not violate the Act because the company did not know at that time that his productivity data had been altered--because it did not receive McCarty's screen shots proving such alterations until after his discharge--is doubly flawed. First, the distorted notion that an employer could successfully defend its improper firing of an employee simply because the employee did not show the employer his proof that the employer's own

relevant records were fraudulent, would turn the law on its head. Second, the record amply supports the Board's finding that Bozzuto's assertion that McCarty was being fired because of low productivity was pretextual. In August 2013, just a month before commencing his union activity, McCarty had been celebrated by Bozzuto for his high level of productivity (*see* Bozzuto's High Achievers, August 23-25, 2013, "Todd McCarty" ("always doing the right job!")). And McCarty testified that in the past when he brought compensation discrepancies to management's attention they would be corrected. Yet after McCarty's involvement with the Union was known to management, Bozzuto chose to ignore his persistent complaints to supervisors and management that his productivity data were being altered, and instead to suspend him, and five weeks later to fire him, for low productivity, without making any effort to look into his complaints of alteration. After receiving the NLRB's April 2014 letter, it took Bozzuto less than five days to verify what McCarty had been protesting--that his data had been altered.

The Board's finding that the discharge of McCarty was motivated by antiunion animus and violated the Act was supported by the record as a whole. Bozzuto's petition for review in this regard is denied.

C. *The Discharge of Greichen*

In ruling that the discharge of Greichen violated the Act, the Board majority found that Bozzuto's stated reason for summoning him to the meeting on October 8--*i.e.*, to enlighten and reassure Greichen as to the bona fides of the company's labor standards--"was a pretext," 365 N.L.R.B. No. 146, slip op. at 4, and instead was "an outgrowth of [Bozzuto's] earlier unlawful warning [on October 1] to Greichen *for discussing those standards* with other employees," *id*. (emphasis added); (*see also* Board brief in support of petition for enforcement at 40 (arguing that substantial evidence supports finding the October 8 events were linked to Greichen's "earlier protected conduct")). The majority found that Greichen would not have been summoned to an October 8 meeting had it not been for his pre-October 1 protected conduct. 365 N.L.R.B. No. 146, slip op. at 5 n.19; *see also id*. at 4 (opining that if Bozzuto was seriously concerned about Greichen's spreading accusations of corporate dishonesty, "it would have done more than simply discharge Greichen"). The majority also found that when Winans and Vaughan told Greichen that he would not be discharged if he attended the meeting, they did not tell him he would not be disciplined in any other way. *See id*. at 4 n.15. We conclude that none of these findings are supported by substantial evidence in the record as a whole.

First, to support its inference that summoning Greichen to the October 8 meeting was pretextual, the Board principally stated that

> [t]he evidence shows that *the meeting was not organized in a manner typical to those held to address complaints about production and safety standards*. Jamie Wright, the industrial engineer Clark directed to participate in the meeting, testified that, contrary to past practice, Clark was "vague and [unspecific,] saying [he wanted] to have a meeting with an associate about standards." Wright asked for more information and Clark declined to give him any more information, noting only that the meeting was about standards. *Wright testified that he was not* told about the nature of the complaint or *given any information to prepare for the meeting* and that it was "atypically vague" and "frustrating."

*Id*. at 4 (emphases added). We have several difficulties with this rationale, given Wright's testimony as a whole.

Although the Board emphasized the facts that Rick Clark did not tell Wright either who the employee was or the nature of the concerns, some lack of specificity is understandable, given that Greichen was not complaining about a particular task or standard but had made a broadside assault on the company, claiming that it was manipulating the labor standards every day for the purpose of cheating the employees. And as to any impact of the lack of detail, Wright said it was "[a] little frustrating" (Tr. 606), that he was only "vaguely frustrated and I got over it in a hurry. I mean this is not a big ordeal [*sic*]. To me it was just okay, Rick, you want

43

me to prepare for a meeting. Okay. Alright. I'll talk about standards. . . . [And the identity of the employee] wasn't something that mattered to me" (*id*. at 614-15; *id*. at 611 ("It was about standards.").)

Further, while the Board also emphasized that Wright himself did not make special preparations for this meeting, Wright testified that when Clark told him on October 8 "to attend a meeting with an employee who had questions about standards," Wright asked whether he could bring "David Heatley, who was [his] senior industrial engineer, and [Clark] said yes. And David developed a small . . . packet of information to review with the employee" (Tr. 557).

The Board found that Heatley's preparation of materials for the October 8 meeting, "which included a 1-page example of Greichen's work," did not undermine "Wright's testimony or [the Board's] conclusion that the stated reason for the meeting was a pretext," giving as its reasons only that "Heatley did not testify" in the hearing before the ALJ and that there was "no evidence indicating why Heatley chose to include an example of Greichen's work in the packet of materials," 365 N.L.R.B. No. 146, slip op. at 4 n.17. It is true that Heatley did not testify. But there is no dispute that he had in fact prepared materials for the meeting, apparently having determined that the employee in question was Greichen (*see*, *e.g.*, Tr. 612-13); that Heatley

44

appeared for the scheduled meeting with the prepared materials in hand (*see id*. at 614-15, 559); that he gave copies of those materials to Wright, his boss (*see id*. at 615); and that the materials themselves were introduced in evidence at the hearing before the ALJ (*see id*. at 557-58). Further, Wright testified before the ALJ as to the nature of the materials, which were screen prints of a "portion of a labor standards table," an example of a "work assignment that ha[d] not been . . . assigned to somebody yet," and an assignment that "actually had been assigned to and was worked [on] by Mr. Greichen." (*Id*. at 558.) Wright also testified that he had "used materials like this before in meetings with other employees." (*Id*.)

In sum, the Board's finding that "the [October 8] meeting was not organized in a manner typical to those held to address complaints about production and safety standards," 365 N.L.R.B. No. 146, slip op. at 4, is not supported by the record as a whole. It is instead belied by the facts that the chief industrial engineer was asked to attend the meeting; he was told that the subject was labor standards; he asked to have his senior assistant engineer attend the meeting; that assistant assembled, in advance of the meeting, materials on the labor standards and reporting forms to be used by employees; the assistant engineer determined the identity of the employee in question and included in the meeting materials an example of that

45

employee's records; the assistant engineer gave copies of the materials to the chief engineer for the meeting; both engineers showed up at the time and place scheduled for the meeting; and the chief engineer testified that he had "used materials like this before in meetings with other employees" (Tr. 558).

Given the context of a meeting called to correct Greichen's understanding of the labor standards, it is difficult to fathom the Board's stated need for additional evidence as to why the materials brought to the meeting included not only generic labor standard materials but also an example of Greichen's own work, as a frame of reference with which Greichen would be familiar. What does seem atypical was the accusatory nature of Greichen's complaint.

Second, the Board appears to have found that Greichen in fact was not given any assurance "that there would be *no* adverse consequences if he attended the [October 8] meeting," 365 N.L.R.B. No. 146, slip op. at 4 n.15 (emphasis added), stating that the recorded evidence

> of Winans' and Greichen's conversation prior to the meeting reflects *only* that Greichen understood that he would not be *discharged* if he attended the meeting, rather than that he would not be *disciplined* as he had been just a week earlier,

46

*id*. (first emphasis added; other emphases in original). The tape itself does not reflect that Greichen's understanding was so limited, for in that conversation--surreptitiously recorded by Greichen--his acknowledgement of his understanding as to whether he would or would not be discharged was not the end of the discussion (*see* Transcription of Tapes ("Tape") at 21). Rather, the Board failed to note that after that acknowledgement, Greichen evinced concern precisely about the possibility of lesser disciplines as well, as he proceeded to point out that he had attended a meeting the week before, in which he was criticized for his "behavior" (*id*.). And after further discussion, Vaughan reiterated that if Greichen refused to attend the meeting "that is considered insubordination" and "you're going to be suspended pending [termination]" (Tape at 24); but Vaughan told him if you do attend "there's nothing here that's unsafe or discriminatory or harassment in this meeting," "you're not going to lose incentive [or pay]," "we're *not* doing *anything negative* to you" (*id*.) (emphases added)). Greichen then said "My choice is not to go to the meeting." (Tape at 24-25.) The finding that Greichen did not understand that attending the meeting would not expose him to "any[]" discipline is not supported by the record.

Finally, while the Board majority agreed with the ALJ's view that it was impossible to "separate" the October 8 order that Greichen meet with management

47

from the improper October 1 warning to Greichen that he should not discuss terms and conditions of employment with his coworkers, *see*, *e.g.*, 365 N.L.R.B. No. 146, slip op. at 17 (ALJ stating "I frankly don't see how one can separate these"); *id*. at 4 (Board "agree[ing] with the judge that [Bozzuto's] insistence that Greichen attend the October 8 meeting to discuss his ongoing concerns about [Bozzuto's] productivity standards was an outgrowth of [Bozzuto's] earlier unlawful warning [on October 1] to Greichen for discussing those standards with other employees"), the record does not reveal such a connection. We have seen no evidence, for example, that after October 1 Bozzuto subjected Greichen to surveillance to see whether he was disregarding its (unlawful) instruction not to discuss working conditions with his coworkers, or otherwise targeted him in an effort to "*create*[ an] allegedly 'for cause' basis for discharge," *Consolidated Bus*, 577 F.3d at 479 (emphasis in original); *see id*. at 474 n.2 (employer conceded that it followed and surveilled an employee, and singled him out for performance testing because of its antiunion animus). Rather, on October 8, Bozzuto was responding to Greichen's approach to Winans, and to Greichen's disclosure that he had begun engaging in conduct that was qualitatively different.

Whereas Greichen had previously been complaining merely that the standards did not provide enough time to complete the assigned tasks, there is no

evidence that his October 1 complaints impugned the company's honesty and integrity. On October 8, however, "*Greichen told Winans* that '*he tells anybody and everybody* he can that he believes [the Company is] *purposely changing the daily standards in order to screw the associates*'" (Board brief in support of petition for enforcement at 8-9 (quoting Winans Memorandum of Greichen's October 8 statements (emphases ours))). This is a serious qualitative difference. As stated by the Board dissenter, "This should go without saying, but I will say it anyway: complaining that [Bozzuto's] *production standards are too demanding* and *accusing [Bozzuto] of being a wage cheat* are very different matters . . . ." 365 N.L.R.B. No. 146, slip op. at 10 (emphases added). The Board majority's view that if Greichen had made no previous complaints about the standards he would not have been called upon by management to address his accusations of corporate dishonesty--which he said he was telling to anyone who would listen--is unrealistic.

In sum, despite Bozzuto's now-conceded violation of the Act on October 1 by warning Greichen for complaining to coworkers about the stringency of the labor standards, we cannot conclude that substantial evidence supports the Board's finding that, if he had not previously complained about tight labor standards, Greichen would not have been ordered to attend the October 8 meeting with respect to his

49

accusation--which, according to his own description, he widely trumpeted--that Bozzuto was intentionally "screw[ing]" the employees.

Greichen's refusal to attend the meeting constituted insubordination. For such conduct, Bozzuto had a no-tolerance policy that predated any union-related activity and called for termination of an employee upon the first occurrence of insubordination. Bozzuto's insistence that Greichen, in light of his accusations of cheating, attend a meeting with the engineers in order to educate him as to why he was wrong about the labor standards, and its termination of his employment upon his steadfast refusal to attend, did not violate the Act.

D. *The Board's Remedies*

In light of our conclusions that Bozzuto did not violate the Act in discharging Greichen and posing the "what's going on with this union stuff" question to McCarty, the remedies ordered by the Board with respect to those findings are not enforced.

We also do not enforce the Board's order that its findings of unfair labor practices and its remedial notice be read aloud by Clark, or by a Board member in Clark's presence, at a meeting of Bozzuto's employees. The ALJ declined to

recommend such an extraordinary remedy, finding it inappropriate. While the Board majority ordered the public reading, it did so without making findings contrary to those of the ALJ that Bozzuto had not been guilty of any prior unfair labor practices and that it was not likely to engage in unfair labor practices in the future. In these circumstances, and with two of the unfair labor practice findings of the ALJ and the Board being overturned, the extraordinary remedy of a public reading to employees is even more inappropriate.

Bozzuto remains liable for engaging in several unfair labor practices-- raising wages in an attempt to discourage employees from joining the Union, adopting a restrictive speech policy for disciplined employees, warning Greichen against talking with coworkers about conditions of employment, and suspending and firing McCarty in reliance on fraudulent alterations of his production records. These are not inconsequential violations. But they do not warrant an order for a public reading.

CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on these petitions and, except as indicated above, have found them to be without merit. The petition for review is granted with respect to the rulings and orders relating to the interrogation of McCarty and the discharge of Greichen, and with respect to the order that the Board's remedial notice be read aloud at a meeting of employees. In all other respects, the petition for review is denied. The Board's cross-petition for enforcement is granted in all respects except those in which the petition for review is granted.