**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2019

(Argued: November 14, 2019　　　Decided:  December 10, 2020)

Docket No. 18-2323-cv(L), 18-2552-cv(XAP)

―――――――――――――――――――――

TIME WARNER CABLE OF NEW YORK CITY LLC,

*Petitioner-Cross-Respondent*,

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent-Cross-Petitioner*.

―――――――――――――――――――――

Before:

　　LIVINGSTON, *CHIEF JUDGE*, LEVAL, AND WESLEY, *Circuit Judges*.

　　Time Warner Cable of New York City LLC petitions for review, and the National Labor Relations Board cross-petitions for enforcement, of a Board ruling that Time Warner committed an unfair labor practice by coercively interrogating employees about communications leading to an unprotected demonstration and work stoppage that contravened the no-strike agreement between Time Warner and the Union.  Held, the Board's standard, interpreted to prohibit Time Warner from coercively questioning employees who participated in an unprotected work stoppage about any communication prior to the stoppage except to identify actual participants represented an unexplained and unjustified departure from the Board's precedents. VACATED and REMANDED.

GEORGE PETER CLARK, Kauff McGuire & Margolis LLP, New York, NY (Daniel Kirschbaum, Kenneth A. Margolis, Kauff McGuire & Margolis LLP, New York, NY *on the brief*), *for Petitioner/Cross-Respondent*.

KIRA DELLINGER VOL, National Labor Relations Board, Washington, D.C. (Valerie L. Collins, National Labor Relations Board, Washington, D.C., *on the brief*), *for Respondent/Cross-Petitioner*.

LEVAL, *Circuit Judge*:

Time Warner Cable of New York City LLC ("Time Warner") petitions for review of a June 22, 2018 Decision and Order by the National Labor Relations Board ("the Board") finding that Time Warner engaged in unfair labor practices ("ULP") in violation of Section 8(a)(1) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1); the Board cross-petitions for enforcement.  For the reasons set forth below, we VACATE the Board's Decision and Order and REMAND.

## BACKGROUND[1]

Time Warner operates facilities in New York City and New Jersey, including one on Paidge Avenue in Brooklyn that provides telecommunication services to customers in southern Manhattan. The staff at that facility includes service technicians and their foremen, who are jointly represented by Local Union No. 3, International Brotherhood of Electrical Workers, AFL-CIO ("the Union") in a single, multi-facility unit.

On March 31, 2013, the regional collective bargaining agreement ("CBA") between the Union and Time Warner expired. That agreement contained a no-strike clause, which provided: "There shall be no cessation or stoppage of work, service or employment on the part of or the instance of either party, during the term of this agreement." Joint App'x 632. Several days earlier, on March 28, 2013, the Union and Time Warner had executed a Memorandum of Understanding ("MOU"), which summarized agreed-upon changes for a renewed CBA. Time Warner's May 14, 2013 proposed draft of a successor CBA retained an identical no-strike clause, and neither the MOU

---

[1] The facts recounted here—as set forth in the June 22, 2018 NLRB Decision and Order and the June 14, 2016 Decision by the NLRB's Administrative Law Judge—are undisputed. Pet'r's Br. 3.

nor the negotiations regarding proposed riders to the CBA (which continued for over a year) included any mention of changing it.

On April 1, 2014, Time Warner issued two-day suspensions to several foremen for violating a new company directive regarding when and where employees were required to carry tools. Several of the foreman notified Derek Jordan, the Union's business agent, that they had been suspended and that, in at least one instance, a foreman was suspended without union representation, in arguable violation of the foreman's rights under *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975) (establishing an employee's right to union representation during an investigatory interview she reasonably fears may result in disciplinary action). Jordan and other Union representatives then called for a "safety meeting" for union members, to be held outside the facility on the following morning.

Shortly before 6:30 a.m. on April 2, 2014, Jordan positioned his car in the middle of the street, perpendicular to the direction of traffic, outside the Paidge Avenue facility. By 6:33 a.m., at Jordan's direction, six more employees had similarly positioned their vehicles on Paidge Avenue, where they obstructed public traffic and prevented Time Warner's service trucks

4

from departing for work assignments. Over the next hour, approximately fifty employees, many of whom were scheduled to start work between 6:30 and 8:00 a.m., gathered around the vehicles, contributing to the obstruction of traffic. During that time, Jordan and other union representatives distributed fliers regarding workplace safety and employees' *Weingarten* rights. At about 7:30 a.m., Jordan gathered the participants around him and spoke to them about the topics covered by the distributed fliers. The gathering dispersed and the traffic obstruction was removed at about 8:00 a.m. Because service trucks were effectively trapped within the facility from 6:30 to 8:00 a.m., "this obstruction caused a 'ripple effect' of delayed or missed service appointments for the rest of the day." Joint App'x 625.

Time Warner investigated the incident to identify those responsible for the demonstration and the resulting disruption to service appointments. Using video recorded by the facility's security cameras, Time Warner identified a number of the employees who had been present. Each identified employee was then summoned to an investigatory interview at which supervisors and human resource managers asked each employee a series of questions from a standardized questionnaire. The questions put to the

employees included whether they attended the April 2 gathering, how and when they arrived, and whether they parked. If an employee denied being present, he or she was shown photographic evidence to the contrary. Interviewees were also asked about their familiarity with the CBA's no-strike clause, which the interviewers then read aloud to each interviewee. Employees were informed that their participation in the demonstration subjected them to "discipline" and "possible termination." Joint App'x 634– 35. The employees were also asked about conduct predating the demonstration, specifically: "Who told you about this gathering?"; "When did you receive notification of the gathering?"; "How was this event communicated to you?"; and "What were you told about the reason for the protest?" Joint App'x 628. The first three of these questions regarding pre-demonstration communications are the focus of this appeal.

Several separate proceedings regarding the demonstration followed. On April 16, 2014, Time Warner filed suit in the United States District Court for the Eastern District of New York, alleging claims under the Labor Management Relations Act, 29 U.S.C. § 185 (1994), and under state law, seeking injunctive relief and damages. *See Time Warner Cable of N.Y.C. LLC v.*

*Int'l Brotherhood of Elec. Workers*, 170 F. Supp. 3d 392, 402, 409 (E.D.N.Y. 2016).

On April 18, 2014, the Union filed an unfair labor practice ("ULP") charge before the Board (the action that ultimately led to this appeal). And, on May 5, 2014, Time Warner initiated an arbitration against the Union, contending that the demonstration violated the no-strike clause. In the latter proceeding, the Union and Time Warner voluntarily submitted to arbitration the question whether the demonstration violated the no-strike clause. Having concluded that the Union had waived its argument that the no-strike clause had not been extended after the March 2013 expiration of the CBA, the arbitrator determined that the April 2 demonstration violated that clause. This court affirmed the arbitral decision. *See Time Warner Cable of N.Y.C. LLC v. Int'l Brotherhood of Elec. Workers*, 684 Fed. App'x 68, 71 (2d. Cir. 2017) (summary order).

This appeal arises from the Board's June 22, 2018 Decision and Order resolving the Union's ULP charge of April 18, 2014. The Union alleged that Time Warner's post-demonstration interrogation of employees constituted coercive interrogation in violation of Section 8(a)(1) of the Act and that the suspensions of employees who attended that demonstration unlawfully

discriminated against those employees for participation in protected union activity in violation of Section 8(a)(3). Based on the prior arbitration proceeding and its affirmance by this court, the Board "treat[ed] it as established that the April 2 demonstration violated the parties' no-strike clause" and therefore concluded that the demonstration was unprotected. Joint App'x 627. It accordingly found that Time Warner did not violate the Act by suspending employees who participated in that demonstration. In this appeal, the parties do not challenge the Board's determinations that the demonstration was unprotected and that the resulting suspensions were lawful.

On the other hand, the Board concluded that three of Time Warner's questions—"Who told you about this gathering?"; "When did you receive notification of the gathering?"; and "How was this event communicated to you?"—were unlawfully coercive under Section 8(a)(1). Joint App'x 629. The Board ruled that, in conducting interrogations into this unprotected activity, Time Warner was "required to focus closely on the unprotected misconduct and to minimize intrusion into Section 7 activity," and that "[t]here was therefore no need for [Time Warner] to inquire into the activity of any

employees prior to the event, except . . . specifically to identify the additional individuals who were actual participants in the demonstration." Joint App'x 628-29; Pet'r's Br. 11. With respect to the three questions specified above, the Board concluded that Time Warner failed to observe those limitations and accordingly committed an unfair labor practice. Time Warner brought this petition to set aside the Board's Decision and Order.

## DISCUSSION

Time Warner challenges the Board's conclusion barring coercive questioning about anything that occurred prior to the actual demonstration except the identification of additional "actual participants in the demonstration" and the Board's resulting decision that the three questions constituted unfair labor practices under Section 8(a)(1). It argues that decision lacks a reasonable basis in law and departs from the Board's prior interpretations of the Act without explanation for why such a departure is necessary or appropriate. Because we agree that the Board's enunciated standard, at least as applied here, lacks a reasonable basis in law, we remand to the Board for further proceedings not inconsistent with this opinion.

**A. Standard of Review**

"On appellate review, the Board's findings of fact will not be overturned if they are supported by substantial evidence on the record considered as a whole, taking into account whatever in the record fairly detracts from its weight, but giving due regard to the Board's expertise." *Novelis Corp. v. NLRB*, 885 F.3d 100, 106 (2d Cir. 2018) (quoting *NLRB v. Thalbo Corp.*, 171 F.3d 102, 112 (2d Cir. 1999)). Our review of the NLRB's legal conclusions is also deferential: "This Court reviews the Board's legal conclusions to ensure they have a reasonable basis in law. In so doing, we afford the Board a degree of legal leeway," and will uphold the conclusions "if not arbitrary and capricious." *Cibao Meat Prods., Inc. v. NLRB*, 547 F.3d 336, 339 (2d Cir. 2008) (quoting *Long Island Head Start Child Dev. Servs. v. NLRB*, 460 F.3d 254, 257 (2d Cir.2006)). However, "[w]here the Board departs from prior interpretations of the Act without explaining why that departure is necessary or appropriate, the Board will have exceeded the bounds of its discretion," regardless of whether that departure reflects a reasonable interpretation of the Act. *Service Employees Int'l Union, Local 32BJ v. NLRB*, 647 F.3d 435, 442 (2d Cir. 2001) (internal quotation marks and citation omitted).

"We review *de novo* the NLRB's application of the law to the facts, but we defer to the NLRB's choice between two fairly conflicting views." *Beverly Enters., Inc. v. NLRB*, 139 F.3d 135, 140 (2d Cir. 1998) (internal quotation marks and citation omitted).

**B. Relevant Provisions of the National Labor Relations Act**

Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8 defines certain conduct as "unfair labor practice[s]" when committed by an employer or by a union. *Id.* § 158(a)-(b). Challenged conduct must infringe on a right protected by Section 7 before it can constitute an unfair labor practice under Section 8(a)(1). *See id.* § 158(a)(1) ("It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7 of the Act] . . . .").

An employer's questioning of an employee constitutes coercive interrogation violative of Section 8(a)(1) if it interferes with a right protected

by Section 7 and "the words themselves or the context in which they are used . . . suggest an element of coercion or interference." *Bozzuto's Inc. v. NLRB*, 927 F.3d 672, 684 (2d Cir. 2019) (quoting *Rossmore House*, 269 N.L.R.B. 1176, 1177 (1984)). "[A]n interrogation that is 'not itself threatening is not held to be an unfair labor practice unless it meets certain fairly severe standards.'" *Id.* (alteration omitted) (quoting *Bourne v. NLRB*, 332 F.2d 47, 48 (2d Cir. 1964) (per curiam)).[2] The crucial inquiry in determining whether questioning violated the Act is "whether under all of the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act." *Rossmore House*, 269 N.L.R.B. at 1177 & 1178 n.20.

---

[2] To determine whether questioning is threatening or coercive, we look to the five so-called "*Bourne* factors":
   (1) The background, i.e., is there a history of employer hostility and discrimination?
   (2) The nature of the information sought, e.g., did the interrogator appear to be seeking information on which to base taking action against individual employees?
   (3) The identity of the questioner, i.e., how high was he in the company hierarchy?
   (4) Place and method of interrogation, e.g., was [the] employee called from work to the boss's office? Was there an atmosphere of 'unnatural formality'?
   (5) Truthfulness of the reply.
*Bourne*, 332 F.2d at 48; *accord Bozzuto's*, 927 F.3d at 684.

12

**C.  Application**

The principal issue on appeal is the propriety of the Board's ruling that the three questions put by Time Warner to known participants in the demonstration—"Who told you about this gathering?; "When did you receive notification of the gathering?"; and "How was this event communicated to you?"—were unlawfully coercive under Section 8(a)(1).  Notwithstanding the Board's conclusion that the stoppage violated the no-strike clause of the CBA and was therefore "unprotected activity," into which the employer was entitled to inquire coercively, the Board concluded that these three questions intruded into employees' Section 7 protected activity.  Joint App'x 629.[3]  It ruled that the employer's "inquiry was . . . required to focus closely on the unprotected misconduct and to minimize intrusion into Section 7 activity."  Joint App'x 628.  Because Time Warner had established through video evidence what had happened and had identified many of the employees who participated, the Board concluded that Time Warner had "no need . . . to inquire into the activity of any employees prior to the event, except . . .

---

[3] The Board did not analyze the legality of additional questions asked by Time Warner because finding additional questions to violate the Act would have been "essentially cumulative."  Joint App'x 629.

specifically to identify the additional individuals who were actual

participants in the demonstration." Joint App'x 628–29. The Board therefore

ruled that these questions constituted a ULP.

Time Warner challenges the Board's restriction, contending that its

standard lacks a reasonable basis in law and departs from the Board's

precedents without explanation for why that departure is necessary or

appropriate. *See Service Employees*, 647 F.3d at 442. As described above, the

Board's articulated legal standard has two parts: Time Warner was both

"required to focus closely on the unprotected misconduct" and also to

"minimize intrusion into Section 7 activity." Joint App'x 628. In response to

Time Warner's challenge, we conclude the portion of the Board's standard

requiring that in coercive questioning, employers "focus closely" on

unprotected activity where it might touch on protected activity has a

reasonable basis in law; but we conclude that the Board's requirement that an

employer "minimize" intrusion into Section 7 activity in such questioning, at

least as understood by the Board in this case, does not. We address each part

of the Board's standard in turn.

Time Warner contends that, under the Board's precedents, when an employer conducts an investigation "in reaction to" unprotected activity, the employer has broad latitude to question employees about any matter and is not required to focus closely on the unprotected activity or minimize intrusion into protected activity. But the cases on which Time Warner relies do not support such a broad rule. Many of the cases Time Warner cites do not even consider the issue of coercive interrogation, and those that do say nothing about the content of the interrogation at issue. In short, Time Warner points to no precedent that supports its argument that an employer is free to coercively interrogate employees about any subject—however intrusive into protected activity—merely because that questioning is prompted by unprotected conduct of an employee.

In support of its argument, Time Warner relies heavily on the Board's decision in *Preferred Building Services, Inc.*, 366 N.L.R.B. No. 159 (2018), arguing that it "clearly stands for the proposition that employer conduct, such as an alleged interrogation, that occurs in response or reaction to an employee's unprotected activity does not violate the act." Pet'r's Br. 18. That misreads the *Preferred Building Services* ruling.

15

In that case, janitors brought ULP charges against the company alleged to be their employer, a contracting company that had subcontracted the job at which they were employed, contending that the company violated Sections 8(a)(3) and 8(a)(1) by cancelling contracts and discharging, threatening, interrogating, and surveilling the employees in response to picketing activity. *Preferred Building Servs.*, 366 N.L.R.B. No. 159, at *1. The respondent raised an affirmative defense that the picketing was secondary activity prohibited by Section 8(b)(4)(ii)(B), that the picketing was therefore unprotected, and that the interrogations and disciplinary action taken in response to that unprotected activity were not unlawful. *Id.* The ALJ rejected this affirmative defense, but the Board reversed, ruling that the picketing activity was unlawful and unprotected, and, as a consequence, the employer was entitled under the Act to take the particular actions it took in response. *Id.*

Despite having mentioned in its description of the case's procedural history that the janitors had alleged among their ULP charges that they had been unlawfully interrogated, the Board did not specify or in any way analyze the questioning conducted. The Board's decision focused entirely on whether the employees' picketing was protected. Nor did the ALJ's decision

16

reveal the nature of any questioning conducted in reaction to the picketing or suggest that any of it intruded into protected activity. Thus, the Board's summary conclusion that the company's "reaction to the employees' unprotected picketing did not violate the Act" based on the unprotected status of the picketing, *id.*, says nothing about the scope of questioning available to an employer in an investigation conducted in reaction to unprotected activity.

Nor does Time Warner find support in the cases relied upon by the Board in *Preferred Building Services*. In *Martel Construction, Inc.*, 302 N.L.R.B. 522 (1991), the Board remanded because the ALJ, in ruling against the employer, failed to consider the employer's affirmative defense that its termination of and threatened disciplinary action against several employees were lawful because those actions were taken in response to allegedly unprotected picketing activity. *Id.* at 522. In *Rapid Armored Truck Corp.*, 281 N.L.R.B. 371 (1986), the Board affirmed an ALJ's dismissal of charges that an employer committed unfair labor practices against several employees—including discharging those that participated in a strike, threatening others with discharge if they joined the instigating union, refusing to rehire

employees that participated in a strike, and conditioning payment of accrued vacation pay based on strike participation—because those actions were taken in response to an unprotected strike. *Id.* at 382. In neither *Martel* nor *Rapid Armored*, however, did the Board or the ALJs consider a ULP charge based on coercive interrogation, and neither case considered the permissible scope of interrogation touching on protected activity when conducted in the course of an investigation into unprotected activity. Those precedents do not support Time Warner's argument.

The remaining authorities cited by Time Warner, rather than supporting its argument that an employer is entitled to question employees without limitation when the questioning is in reaction to unprotected activity, instead demonstrate that the first portion of the Board's challenged standard—that an employer's coercive interrogation must "focus closely" on unprotected conduct—is consistent with established Board precedent. In *Fresh & Easy Neighborhood Market, Inc.*, 361 N.L.R.B. No. 12 (2014), for example, the Board permitted an employer to question an employee regarding her motivation for engaging in conduct that was the subject of harassment complaints both by and against the employee—even though that

conduct had occurred during the exercise of the employee's protected concerted activity—because that "questioning . . . was *focused on* and *narrowly tailored* to enabling the [employer] to conduct a legitimate investigation into [the] complaint." *Id.* at *12 (emphasis added). Significantly, the Board noted that there was no evidence that the employer's questioning "delve[d] into [the employee's] motives or sentiments beyond the narrow facts surrounding the complaints at issue." *Id.* The Board's narrow ruling in favor of the employer in that case depended on the constrained purpose of the employer's questioning and the employer's assurances that it would protect the employee against retaliation.[4]

Time Warner similarly reads too much into the Board's ruling in *HCA Health Servs. of N.H., Inc.*, 316 N.L.R.B. 919 (1995). Time Warner cites *HCA* for the proposition that questioning of employees does not violate the Act— regardless of how intrusive into protected activity the questioning is—if the conduct about which the interrogation took place was not protected. But *HCA* does not support such a broad assertion; to the contrary, it provides

---

[4] We neither express nor imply any views on whether Time Warner's three questions complied with the "focus closely" prong of the Board's standard. That is a question the Board will be at liberty to resolve on the remand which we direct in the latter portion of this opinion.

precedent for the Board's requirement, enunciated here, that an employer must "focus closely" on unprotected activity when coercively questioning employees.

Time Warner correctly observes that, in *HCA*, the Board affirmed the ALJ's dismissal of a ULP charge, which concluded: "As the conduct about which the interrogation took place was not protected, I do not find the interrogation violated the Act." *Id.* at 931. Nonetheless, when read in context, those words cannot be construed to have the meaning that Time Warner ascribes to them: that, when an investigation is initiated into unprotected conduct, there are no limits on the questions an employer may put to employees.

In *HCA*, an operating room nurse who had been disciplined by her supervisor and believed herself to be in danger of discharge, spread false, malicious rumors about the supervisor's prior employment in an effort to convince other nurses to join her in an effort to have the supervisor fired. *Id.* at 929. When this came to the attention of the supervisor, she questioned the nurse as to why she had done this. *Id.* at 925. The nurse took the position that she had done it because she believed the supervisor's bad management was

deleterious to the performance of the operating room. *Id.* at 925, 930.

Following an investigation by the hospital, the nurse was discharged. She

brought a ULP complaint asserting that the hospital had unlawfully

interfered with her right to seek concerted action to remedy the allegedly

poor management practices to which she objected. *Id.* at 920.

The ALJ concluded that the interrogation and ultimate discharge of the

nurse were motivated solely by the nurse's malicious spreading of a false,

defamatory rumor for her own personal protection and had nothing to do

with the nurse's dissatisfaction with her supervisor's management, *id.* at 930

("This is not a case where an employer is shown to reject employee input on

issues of working conditions . . . ."), and that the supervisor, "on learning of

the spreading of the [false] rumor . . . with the obvious purpose of stirring up

support to get [the supervisor] fired, reasonably wanted to verify what was

happening," *id.* at 931. Critically, the ALJ reasoned that the nurse's spreading

of the false rumor was indivisible from any of her other actions, including

those that might have otherwise been protected. *See id.* ("[O]ne cannot

divorce the spreading of the rumor from any other action taken by [the nurse].").

Understood in context, the *HCA* decision did not establish that an employer is at liberty, without limitation, to conduct coercive questioning into protected activity so long as the interrogation is in reaction to unprotected activity. Instead, the ALJ permitted coercive questioning properly directed at the nurse's unprotected spreading of a false defamatory rumor, notwithstanding that the questioning would inevitably also touch on the nurse's protected concerted activity, because the unprotected and protected conduct was inextricably intertwined. Far from establishing for an employer broad latitude to inquire about any subject when investigating unprotected activity, *HCA* is correctly understood as permitting coercive questioning to touch upon protected activity when the protected activity is closely related to

the unprotected activity and the questioning is properly focused on the unprotected aspects of that conduct.[5]

Contrary to Time Warner's argument, while coercive questioning of employees is permitted when it relates solely to unprotected activity, the Board's precedents do provide support for at least the "focus closely" portion of the standard the Board announced here. The employer's questioning in *Fresh & Easy* was permitted because it "focused on" and was "narrowly tailored" to an investigation of unprotected harassment, and, to the extent that the questioning touched on protected activity, it did so only because the protected conduct was inextricably intertwined with the unprotected conduct about which the employer could lawfully inquire. 361 N.L.R.B. No. 12, at *12. Similarly, in *HCA*, coercive questioning about an employee's unprotected conduct, despite also touching on her protected concerted communications with other employees, was permitted because it was impossible to separate

---

[5] Time Warner also contends that *Alton Box Board Co.*, 155 N.L.R.B. 1025 (1965), supports its position. But that case is inapposite. In *Alton Box*, the Board permitted an employer to question an employee about conversations related to a planned work stoppage because the interrogation itself was not coercive, and thus, did not infringe on Section 7 protected activity. 155 N.L.R.B. at 1042. Here, in contrast, Time Warner does not argue—nor could it—that the questioning of employees was not coercive.

her protected motivations from her unprotected conduct. 316 N.L.R.B. at 931.

And in *St. Louis Comprehensive Neighborhood Health Center, Inc.*, 248 N.L.R.B. 1078 (1980)—also cited by Time Warner—the Board permitted coercive interrogation that was "peripherally related to union activities" because it was "directed not at that protected and concerted activity," of lawful picketing but rather at unprotected "picket line misconduct" including violence directed at other employees. *Id.* at 1087. Each of the cases supports a standard requiring employers to carefully distinguish between unprotected activity at which they may direct coercive questioning and protected activity at which coercive interrogation may not be directed but on which, in some circumstances, coercive interrogation may touch to a limited, incidental, or peripheral extent. We therefore conclude that the first portion of the standard enunciated by the Board, that an employer's coercive interrogation must "focus closely" on unprotected activity, has a reasonable basis in law and does not depart from the Board's prior interpretations of the Act.

On the other hand, it is less clear that there is precedent for the remainder of the Board's enunciated standard requiring employers to "minimize" intrusion into Section 7 activity, Joint App'x 628, depending on

24

the meaning the Board assigned to the ambiguous word "minimize."

Dictionary definitions of "minimize" include both, "[t]o reduce to the smallest possible amount, extent, size, or degree," or simply, "[t]o reduce." *Minimize, The American Heritage College Dictionary* (4th ed. 2007).

In interpreting the "minimize" prong of its enunciated standard as prohibiting inquiry into pre-demonstration activity except to identify additional "actual participants in the demonstration," Joint App'x 628–29, the Board apparently employed the more restrictive alternate meaning of the word—as the antonym of "maximize"—allowing questioning to touch on protected activity no more than to "the smallest possible amount [or] extent," *Minimize, The American Heritage College Dictionary* (4th ed. 2007). This application of the standard was a departure from the Board's precedents.

As noted above, in *HCA*, *Fresh & Easy*, and *St. Louis Comprehensive*, where, as in this case, the unprotected activity that was the legitimate focus of the employer's inquiries was potentially intertwined with protected activity, such that any inquiry into the planning or motivation of the unprotected activity inevitably risked eliciting answers that would bear on the exercise of protected rights, the Board has previously allowed questioning that could

25

elicit considerably more than the "smallest possible amount" of such overlap into protected activity.

Had the Board's standard employed "minimize" intending its less extreme definition—merely "to reduce"—and required an employer to demonstrate something like reasonable care to avoid excessive interference in protected rights by closely focusing on unprotected conduct, while nevertheless recognizing that some overlap might permissibly occur when the unprotected conduct is intertwined with the exercise of protected rights, that would have been consistent with the Board's precedents in *HCA* and *Fresh & Easy*. Both cases acknowledge that lawful coercive questioning properly directed at unprotected conduct will sometimes unavoidably (and permissibly) touch on some closely related protected activity to a limited, incidental, or peripheral extent. Had the Board adopted this less restrictive definition of "minimize," its standard would also have been consistent with *St. Louis Comprehensive*, in which the Board similarly required that coercive questioning be "directed at" unprotected activity, while also permitting some intrusion into the "peripher[y]" of protected union activities, where that peripheral intrusion results from the proximity of the unprotected activity,

which is the proper focus of questioning, to protected activity. *See* 248 N.L.R.B. at 1087.

Instead, the Board's standard barred Time Warner from seeking information of very high pertinence to its investigation of the unprotected demonstration. By allowing no inquiry into any conduct preceding the demonstration except to identify "actual participants," the Board disallowed highly relevant inquiry into identification of those deserving of discipline and into making appropriate distinctions among them. For example, it prohibited Time Warner from seeking to identify those most responsible for the unauthorized stoppage because they suggested it, argued in its favor, or solicited or directed others to participate in it, regardless of whether those persons also participated in the stoppage. It also barred Time Warner from seeking information that would distinguish between those employees whose presence at the demonstration was less culpable, because they had attended based on a belief that it was a meeting about workplace safety and *Weingarten* rights, from those who were more culpable, because they attended for the purpose of participating in the unprotected stoppage.

The Board incorrectly contends that its ruling in *Can-Tex Industries*, 256 N.L.R.B. 863 (1981), supports its position. The ALJ's decision in that case, summarily affirmed by the Board, concluded that the dismissal of Billy Jester constituted an unfair labor practice. *Id.* at 872. Jester had engaged in concerted advocacy of a work stoppage to be accomplished by shutting down certain manufacturing equipment that required complex, time-consuming processes to restart, and by simultaneous striking and picketing. *Id.* at 864–65, 870.

The first issue confronted was why Jester was fired. Jester contended that he was fired because of his advocacy in support of the work stoppage, while the employer contended he was fired not because of that advocacy but because of unspecified misconduct and insubordination. *Id.* at 870. The ALJ was persuaded that the employer's claim of insubordination and misconduct "constituted rationalization designed to develop a pretextuous reason for the discharge of Jester." *Id.* at 871. The ALJ rejected the employer's explanation and concluded that Jester was fired because of his advocacy in support of conduct creating a work stoppage, all of which the ALJ found to be protected.

*Id.* at 864–65, 870. Accordingly, the ALJ ruled that the discharge interfered with rights protected by Section 7.

As a fallback position, the ALJ went on to rule that "even if the turning off of equipment in a shutdown constituted unprotected conduct, when an employee like Jester has engaged in concerted activity which is protected, mere talk, *as in this case,* would not remove him from the protection of the Act." *Id.* at 872 (emphasis added). This is the portion of *Can-Tex* the Board contends furnishes precedential justification for its ruling here that any inquiry into pre-demonstration activity other than to identify actual participants infringed on protected rights.

We respectfully disagree. The ALJ's classification of Jester's prior advocacy, which predated the work stoppage by two months, as "mere talk" at worst, and therefore protected even if the conduct he advocated would have been unprotected, was specific to the facts of that case, as emphasized by the words, "as in this case." *Id.* The ruling did not purport to establish that any and all verbal communication supportive of unprotected conduct is protected, even from employer inquiry, regardless of the content of that communication or the closeness of its relationship to the occurrence of the

unprotected conduct. For example, *Can-Tex* does not stand for the proposition that, if an employee exhorts co-workers to burn down the employer's building in protest against unfair wages, the employer is prohibited from interrogating its employees to identify who advocated arson against their property or from terminating the employee for that advocacy simply because it was verbal and predated the demonstration. *Can-Tex* does not furnish precedent for the proposition that any and all words spoken on April 1 (whatever they may have been) supporting a work stoppage automatically constituted "mere talk" and were protected not only from disciplinary action but from questioning conducted so as to learn the facts of, and assign responsibility for, an unprotected work stoppage.

The Board also contends that *KQED, Inc.*, 238 N.L.R.B. 1 (1978), provides precedential support for its ruling. [6] Once again, we disagree. There, an employee, Richard Laskov, filed a ULP charge against his employer, a network that produced the television show for which Laskov worked as a cameraman, alleging that he was unlawfully discharged because he made

---

[6] The Board also initially relied on *Sunrise Senior Living*, 344 N.L.R.B. 1246 (2005), and *Tony Silva Painting Co.*, 322 N.L.R.B. 989 (1997), but, in a June 12, 2019 letter to the court, the Board disavowed reliance on those cases. *See* Dkt. No. 102.

comments that were arguably supportive of a work stoppage. *Id.* at 2.

Specifically, during a meeting in which the employer informed Laskov and the rest of the show's crew that certain film-editing work would be assigned to a nonunion employee, which several employees viewed as a violation of the contract between the union and the network, Laskov asked, "If you do this, do you expect us to come to work tomorrow?" *Id.* When directed by a supervisor to "stop these idle threats," Laskov responded, "It's not a threat." *Id.* The following day, Laskov apologized to the supervisor for "coming on 'a little strong'" and explained that, although his feelings about the assignment of work to a nonunion employee had not changed, he regretted how he had expressed them. *Id.* at 3. Laskov heard nothing further about the conversation and believed the matter to be closed until one month later when he was terminated. *Id.*

The Board summarily affirmed the ALJ's ruling that Laskov's conduct in the meeting constituted protected concerted activity because it was in protest of the employer's assignment of work to a nonunion employee, it was intertwined with similar protests from fellow employees related to the terms and conditions of their employment, and it was designed to achieve

compliance with the contract between the union and the employer. *Id.* In so ruling, it rejected the employer's argument that Laskov's comment was unprotected as a "rhetorical allusion to a work stoppage." *Id.*

*KQED* offers no precedent in support of the Board's ruling in this case. The circumstances were quite different. No work stoppage ever occurred, the employer never coercively interrogated the employee, and the comments at issue—a two-line exchange arguably supportive of a hypothetical work stoppage that never in fact occurred—did not necessarily resemble the communications (unknown to Time Warner when it asked) into which Time Warner inquired. As with *Can-Tex*, the Board's ruling in *KQED* was about the specific comments made in the specific circumstances of that case. *KQED* does not stand for the proposition that any words spoken that have some connection to a legitimate concern over rights protected by Section 7 are necessarily protected. That case simply throws no light on whether Time Warner improperly interfered with Section 7 rights in asking what had been said about planning an unprotected work stoppage that took place the following morning.

In the absence of any supportive precedent, the Board's standard prohibiting Time Warner from questioning its employees about any subject except actual participation in the April 2 demonstration lacks a reasonable basis in law. It is not the Board's use of the phrase "minimize intrusion" that is problematic; it is the Board's interpretation of that phrase to mean "avoid virtually all intrusion," thus barring Time Warner from asking reasonable questions about conduct preceding the actual demonstration.

Time Warner had a legitimate investigatory interest in learning more than the identities of those who "were actual participants" in the demonstration. Employment of a standard that so narrowly constrained Time Warner's inquiry as to bar questions seeking any information other than who were actual participants in the unprotected work stoppage compelled the conclusion that Time Warner's more open-ended questions interfered improperly with Section 7 rights. Because that conclusion was arrived at through use of an unsubstantiated standard, we hereby set aside the Board's conclusion, not because we have reached any determination about the correctness of its result, but because the result was determined through use of an unjustified standard (at least as narrowly interpreted by the Board here).

The mere fact that planning of the unprotected work stoppage may have occurred in conjunction with and alongside planning for a protected meeting (or other protected communications) does not necessarily compel the conclusion that the inquiry was an unlawful interference into protected activity. Under the guidelines established by prior Board precedent reviewed above, there were issues into which Time Warner could reasonably inquire, even in coercive questioning, notwithstanding a risk that, because of the proximity to protected activity, and the fact that Time Warner did not know the answers to the questions it was asking, its questions might unintentionally elicit information about protected activity. That was true, as discussed above, in *HCA*, *Fresh & Easy*, and *St. Louis Comprehensive.* On remand, the Board should determine, employing a standard consistent with its precedent, whether Time Warner's questioning interfered unreasonably with rights protected by Section 7.

## CONCLUSION

The ruling of the Board is hereby VACATED, and the matter is REMANDED for further proceedings not inconsistent with this opinion.